422 S.E.2d 827

**Larry D. BELCHER, Sr., Administrator of the Estate of Larry D. BELCHER, Jr., Deceased, Plaintiff Below, Appellant,**

v.

**CHARLESTON AREA MEDICAL CENTER, a Corporation, Charleston Pediatric Group, a West Virginia Corporation, and M.B. Ayoubi, M.D., Defendants Below, Appellees.**

**No. 20481.**

Supreme Court of Appeals of West Virginia.

Submitted May 5, 1992.

Decided July 15, 1992.

---

Gerald R. Lacy, Henry C. Bias, Jr., Charleston, for appellant.

Ralph C. Dusic, Jr., Karen Speidal Rodgers, Kay, Casto, Chaney, Love & Wise, Charleston, for appellee, Charleston Area Medical Center.

Stephen D. Annand, Paul L. Weber, Shuman, Annand & Poe, Charleston, for appellee, M.B. Ayoubi, M.D.

McHUGH, Chief Justice:

This case is before the Court upon the appeal of Larry Belcher, Sr., administrator of the estate of Larry Belcher, Jr., and plaintiff below, from the judgment of the Circuit Court of Kanawha County.[1] The appellees, and defendants below, are Charleston Area Medical Center (CAMC), Charleston Pediatric Group, Inc., and M.B. Ayoubi, M.D.

I.

The decedent, Larry Belcher, Jr. (Larry), who was seventeen years and eight months old, suffered from muscular dystrophy, and

---

1. Larry Belcher, Sr., and his wife, Drema Belcher, are also plaintiffs below, *individually,* but not *appellants* herein in those capacities. However, because the facts of this case involve repeated references to Mr. and Mrs. Belcher, we refer to them as the "appellants" in this opinion so as to avoid confusion.

was confined to a wheelchair. On December 19, 1986, Larry became choked and stopped breathing. His father, the appellant herein, removed mucus from the decedent's throat and, through mouth-to-mouth resuscitation, revived Larry. Larry was taken to Women & Children's Hospital, part of CAMC, by ambulance. Following an examination by the emergency room physicians, it was determined that Larry had a viral syndrome, or in laymen's terms, a "cold." According to the appellee Ayoubi, because of Larry's muscular dystrophy, the cold had an exaggerated effect on his condition.

Later that day, after being admitted to the hospital, Larry had another breathing failure, and was intubated, placed on a respirator, and transferred to the pediatric intensive care unit.

On December 22, 1986, Ayoubi discussed with the appellants the likelihood of Larry suffering another respiratory arrest and also discussed his (Ayoubi's) concern that Larry would become "respirator-dependent" if he were to remain on it. Furthermore, long-term respirator support would cause Larry's throat to swell shut, thus requiring a tracheotomy and feeding through a tube. Ayoubi also asked the appellants about whether they would want Larry subjected to resuscitative measures, including reintubation, in the event he suffered another respiratory failure.

The next morning, December 23, 1986, Ayoubi contends that the appellants indicated that they had not yet decided on whether Larry should be intubated and placed on a respirator again in the event of another breathing failure. Later that day, December 23, 1986, at 10:30 a.m., Larry was taken off the respirator and was extubated. Small doses of morphine sulphate were prescribed to relieve Larry's pain and anxiety. Ayoubi observed Larry becoming

anxious and apprehensive as he was disconnected from the respirator. Ayoubi advised Larry that he could be reintubated, but Larry motioned his head "no," indicating that he did not want to be reintubated.

Later that day, December 23, 1986, the appellants told Ayoubi that they decided they did not want Larry reintubated or resuscitated unless Larry requested it. Accordingly, Ayoubi had the appellants sign a progress note stating that Larry was not to be reintubated or resuscitated in the event of a respiratory failure.[2] The progress note was formalized into a "Do Not Resuscitate" order.[3]

Larry was not involved in this decision because, as Ayoubi contends: (1) he was emotionally immature due to his disease; (2) he was on medication which diminished his capacity; (3) involving him in the decision would have increased his anxiety, thus reducing his chances of survival; and (4) Larry's parents told Ayoubi that they did not want Larry involved.

At 3:00 a.m. on December 24, 1986, Larry had another respiratory arrest, suffered cardiac failure, and died. The hospital staff attempted, within the limits of the "Do Not Resuscitate" order, to administer "precordial thumps," repositioned his head, and attempted to blow oxygen into his mouth, all to no avail.

The appellants filed this action for wrongful death, alleging medical malpractice, on September 16, 1988, in the Circuit Court of Kanawha County. Following trial, the jury returned a verdict in favor of the appellees.

In this appeal, the appellants raise issues involving: the circuit court's refusal to allow certain proffered rebuttal evidence; and the circuit court's refusal to allow the case to go to the jury on a theory that

**2.** There is a factual dispute over whether the phrase "or resuscitated" appeared on the progress note before or after the appellants saw and signed it. This factual conflict, however, was before the jury, and no error is raised alleging that the circuit court prohibited it from being developed before the jury. In any event, this point has no bearing on this case because our decision does not address factual discrepancies,

but the appropriate legal standard that should have been applied.

**3.** The "Do Not Resuscitate" order is also known as a "No 1–2–3" order, which is generally understood to direct hospital personnel to not assist or intervene when the patient is confronted with a life-threatening situation.

Larry should have been consulted prior to the issuance of the "Do Not Resuscitate" order, thus, recognizing the so-called "mature minor" exception to the common law rule of parental consent.

## II.

### A. *Rebuttal Evidence*

■ Primarily, the appellants contend that the circuit court committed error by refusing to allow rebuttal testimony by their medical expert, Dr. Kenneth Schonberg, a pediatrician who specializes in adolescent medicine.

The appellants focus on four areas in this regard: (1) Dr. Leon Charash testified for the defense, that in December, 1986, hospitals throughout the United States were not required to have a specific policy on "Do Not Resuscitate" orders. The appellants recalled Schonberg for the purpose of proving that Charash's statement was *technically* true, but misleading because there *was* a policy for *all* procedures (or non-procedures); (2) Dr. Potterfield testified for the defense that the morphine sulphate given to Larry did not harm him because the effects of that drug dissipate from the body within one-half to two hours, and since Larry died five hours after the morphine sulphate injections, then this prescription did him no harm. The appellants recalled Schonberg for the purpose of proving that the effect of the drug was cumulative due to Larry's illness; (3) Dr. Potterfield also testified that at the time of Larry's death, the law provided that only parental consent was necessary to perform an operation. The appellants recalled Schonberg to testify that the standard of care involved obtaining the consent of a mature minor as well as that of the parents, or, in the absence thereof, a court order; and (4) Dr. Ayoubi testified that he was not required to discuss with Larry or his parents the possibilities of long-term respirator support as an alternative to the "Do Not Resuscitate" order. The appellants recalled Schonberg for the purpose of testifying that such respirator support constituted a "reasonable alternative" and therefore, it should have been discussed.

We do not agree with the appellant's contentions in this regard. Rather, we agree with the appellees' argument, that the appellants' proffered rebuttal testimony merely amounts to an attempt to reopen their case, and the circuit court did not abuse its discretion in refusing to allow this testimony.

■ It is well established that the trial court has broad discretion in permitting or excluding evidence that is offered as rebuttal evidence. Moreover, the trial court's discretion is especially broad in the situation where the plaintiff's proffered rebuttal evidence is such that it could have *and should have* been part of its case-in-chief.

> As a general rule, the conduct of trials and the order of introducing testimony, subject to well established rules of practice and procedure, rest within the sound discretion of the trial court, and that rule is applicable to the admissibility of evidence in rebuttal which could and should have been introduced by the plaintiff in chief.

Syl. pt. 9, *Edmiston v. Wilson*, 146 W.Va. 511, 120 S.E.2d 491 (1961). Professor Cleckley has spoken to this situation: "Here, the plaintiff is merely requesting an opportunity to do in rebuttal what should have been done in the case in chief. This is not true rebuttal. Rather, it is analogous to a request to permit the plaintiff to reopen its case." Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 3.1(A), at 55 (2d ed. 1986).

The United States Supreme Court has held the following with respect to the trial court's discretion in permitting or excluding rebuttal testimony:

> The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion. *Goldsby v. United States*, 160 U.S. 70, 74, 16 S.Ct. 216, 218, 40 L.Ed. 343, 345 (1895); *United States v. Martinez–Villa-*

*nueva,* 463 F.2d 1336 (CA9 1972); *Nelson v. United States,* 415 F.2d 483, 487 (CA5 1969), cert. denied, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970). Within limits, the judge may control the scope of rebuttal testimony, *United States v. Chrzanowski,* 502 F.2d 573, 575–576 (CA3 1974); *United States v. Perez,* 491 F.2d 167, 173 (CA9), cert. denied *sub nom., Lombera v. United States,* 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974); may refuse to allow cumulative, repetitive, or irrelevant testimony, *Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590, 626 (1974); *County of Macon v. Shores,* 97 U.S. 272, 24 L.Ed. 889 (1877); and may control the scope of examination of witnesses, *United States v. Nobles,* 422 U.S. 225, 231, 95 S.Ct. 2160, 2166, 45 L.Ed.2d 141, 149 (1975); *Glasser v. United States,* 315 U.S. 60, 83, 62 S.Ct. 457, 470, 86 L.Ed. 680, 706 (1942). If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings.

*Geders v. United States,* 425 U.S. 80, 86–87, 96 S.Ct. 1330, 1334–35, 47 L.Ed.2d 592, 598 (1976).

The components mentioned above by the United States Supreme Court are now reflected in Rule 611(a) of the *West Virginia Rules of Evidence.*[4] Rule 611(a) provides:

> **Rule 611. Mode and Order of Interrogation and Presentation.** (a) *Control by Court.*—The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3)

protect witnesses from harassment or undue embarrassment.

The trial court's discretion in permitting or excluding rebuttal evidence comes within the ambit of Rule 611(a). "Reopening of a case, recalling of a witness, and the *acceptance or rejection of rebuttal testimony* are ... examples of situations in which the trial judge must ... determine how the aims of Rule 611(a) can best be implemented.... [H]is decision will rarely be disturbed on appeal." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 611[01], at 30–31 (1991) (emphasis supplied) (footnotes omitted).[5]

█ Accordingly, we hold that under Rule 611(a) of the *West Virginia Rules of Evidence,* a trial court has broad discretion in permitting or excluding the admission of rebuttal testimony, and this Court will not disturb the ruling of a trial court on the admissibility of rebuttal evidence unless there has been an abuse of discretion.[6]

In this case, as we stated previously, we believe that the testimony proffered as rebuttal by the appellants, in reality, amounts to nothing more than an attempt to reopen their case. The substance of the testimony by Dr. Schonberg that the appellants attempted to have admitted as "rebuttal" was already testified to by that witness during the appellants' (plaintiffs') case-in-chief.

Concerning the issue of whether there existed a national standard throughout the United States for having a specific policy on "Do Not Resuscitate" orders, Dr. Schonberg testified on direct examination, as part of the appellants' case-in-chief, that not including Larry in the decision to issue that type of order was inappropriate for the following reasons:

---

4. Rule 611(a) is identical to Rule 611(a) of the *Federal Rules of Evidence.*

5. Professor Cleckley also notes that under Rule 611(a) the trial court has broad discretion in permitting or excluding rebuttal evidence. Cleckley, *supra* § 3.1(A), at 55 (citing *Geders* ).

6. In the context of criminal law, we have held that even if the proffered testimony does constitute rebuttal evidence, it is subject to a harmless

error analysis. "The admissibility of evidence as rebuttal is within the sound discretion of the trial court, and the exercise of such discretion does not constitute ground for reversal unless it is prejudicial to the defendant." Syl. pt. 4, *State v. Blankenship,* 137 W.Va. 1, 69 S.E.2d 398 (1952), *overruled on another point, State v. McAboy,* 160 W.Va. 497, 498 n. 1, 236 S.E.2d 431, 432 n. 1 (1977). *Accord,* syl. pt. 4, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983).

Because that was the national standard, that mature minors, 17 year olds, for any major position, for an amputation, for chemotherapy, for allowing them to die, if they were mature, if they were capable, if they could understand, they had to be part of the discussion relative to their subsequent care. To give other advice would be in conflict with what is national standard, was national standard in 1986.

As part of Dr. Schonberg's proffered rebuttal testimony, he was asked: "[I]n 1986, did the national standard for physicians and hospitals require that the parents and the minor, or the parents or the minor, consent to any treatment or the withholding of any treatment?" Dr. Schonberg replied that "[a] national standard in 1986, that, in dealing with the mature minor, that that mature minor would need to be informed, and one would need to receive his assent to do any major procedure. Here again, regarding Do Not Resuscitate as a major procedure or a nonprocedure."

With respect to the testimony regarding whether the morphine sulphate given to Larry harmed him, Dr. Schonberg, on direct examination during the appellants' case-in-chief, testified that "the administration of morphine to a patient with respiratory compromise, a patient who has a high blood carbon dioxide level, the administration of morphine under those circumstances, if you don't intend to resuscitate the patient if they stop breathing, that is contraindicated and that is a mistake." Furthermore, on cross-examination during the appellants' case-in-chief, Dr. Schonberg testified that because Larry was administered the morphine sulphate when his carbon dioxide level was already very high, it "decreased his ability to respond to that, and it was a contributing factor in his downhill course. Now, that the morphine sulphate was gone or, for pharmacologic purposes, gone five hours later, doesn't excuse what it would have done to him physiologically earlier on in the evening[.]"

Turning to the testimony concerning the consent of Larry, and whether he was a mature minor so as to give consent to issuing the "Do Not Resuscitate" order, Dr. Schonberg testified on direct examination that the national standard of care was that a mature minor must be involved in such discussions. On cross-examination, Dr. Schonberg testified that a 17-year-old minor cannot be denied his right to give consent to a surgical procedure.

Finally, regarding the testimony of whether long-term respirator support would constitute a "reasonable alternative" to the "Do Not Resuscitate" order, Dr. Schonberg testified on direct and cross-examination that informed consent consists of understanding the available alternatives and balancing risks pertaining to such alternatives.

As can be plainly seen from the testimony above, which was given during the appellants' case-in-chief, any attempt to testify to these issues again, as proffered rebuttal, is in reality, an attempt to reopen the appellants' case. We agree with the ruling of the circuit court which was issued after hearing the proffered rebuttal testimony. In that ruling, the circuit court stated:

I find that during [Dr. Schonberg's] testimony in chief regarding the consent policy and so forth that he went into this morning, proposed to go into regarding CAMC, that that matter was presented by him to the jury during his testimony in chief and that what he proposed to tell the jury today was not in rebuttal, nothing new, nothing significant and new, and nothing that could not have been explored originally if it was felt necessary.

Based upon the above, the circuit court did not abuse its discretion by refusing to allow admission of the appellants' rebuttal testimony.

## B. *Consent of Minor*

The appellant also contends that informed consent by Larry, even though he was a minor, should have been required before issuing the "Do No Resuscitate" order. This issue implicates the giving of certain instructions, particularly the Court's Instruction No. 12, which follows

this Court's holding in *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982).

### 1. Liability of CAMC

■ The appellee CAMC points out that the *Cross* holding stands for the proposition that the medical decisions made by the patient are between the physician and the patient, or the patient's parents/guardians, and *not* the hospital. We agree.

In syllabus point 7 to *Cross*, we held:

When a patient asserts that a particular method of medical treatment, such as surgery, was performed by the patient's privately retained physician without the patient's consent, the hospital where that treatment was performed will ordinarily not be held liable to the patient upon the consent issue, where the physician involved was not an agent or employee of the hospital during the period in question.

In *Cross*, we relied upon the holding of the Court of Appeals of New York in *Fiorentino v. Wenger*, 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967). In *Fiorentino*, the New York court stated that "it would not be just for a court, having the benefit of hindsight, to impose liability on a hospital for its failure to intervene in the independent physician-patient relationship." 280 N.Y.S.2d at 379, 227 N.E.2d at 300.

The appellants urge this Court to move away from this principle. In support of their contention, the appellants cite the case of *Felice v. St. Agnes Hospital*, 65 A.D.2d 388, 411 N.Y.S.2d 901 (1978) for the proposition that the holding enunciated in *Fiorentino* has been left in doubt. We do not agree with this contention.

In *Felice*, the court stated:

Present day hospitals, as their manner of operation demonstrates, do far more than furnish facilities for treatment.... Whatever may have been the case in earlier times, today the hospital takes an increasingly active part in supplying and regulating the purely medical care the patient receives. The fact that certain doctors are not employees of a hospital does not mean such institution cannot be held liable for adverse effects of treatment or surgery approved by the doctors.

411 N.Y.S.2d at 907 (citation omitted).

However, as the appellants acknowledge, *Felice* does not deal with the issue of a hospital's liability due to failing to obtain informed consent, but with the general issue of a hospital's liability for the *acts* of its physicians. The court in *Felice* says nothing to indicate that the holding of *Fiorentino* has been left in doubt.[7] *See also Pauscher v. Iowa Methodist Medical Center*, 408 N.W.2d 355, 362 (Iowa 1987) (Hospital has no "duty to inform a patient of matters that lie at the heart of the doctor-patient relationship."); *Wilson v. Lockwood*, 711 S.W.2d 545, 549 (Mo.Ct. App.1986) ("[H]ospital has no duty to inform the patient of risks of surgery and alternative methods of treatment simply because it furnishes a consent-to-surgery form."); *Ritter v. Delaney*, 790 S.W.2d 29, 32 (Tex.Ct.App.1990) (Doctor ordering nurse to get patient's signature on permit to operate does not make hospital the doctor's agent, thus imposing upon hospital a duty to obtain informed consent of patient.).

The appellee CAMC maintains that the reasoned logic behind syllabus point 7 of *Cross* is as sound today as it was when *Cross* was decided ten years ago. Specifically, the appellee CAMC points to the special relationship between a patient and his or her physician, asserting that a requirement to involve the hospital personnel would be disruptive rather than facilitative to the consent process.

■ In this case, the record is clear that the employees of the hospital were aware of the discussions between Dr. Ayoubi and Larry's parents, and that it was apparent that Larry's parents consented to the treatment given. Furthermore, there is no dispute that the appellee Ayoubi was

---

**7.** Moreover, even if *Fiorentino* was *expressly* overruled, this would not necessarily abrogate the holding of this Court's *Cross* case.

privately retained, and the appellants could have chosen to not seek his treatment for Larry.[8]

We agree with the appellee CAMC on this point, and therefore, we reaffirm our holding in syllabus point 7 to *Cross v. Trapp*. Consequently, the judgment of the circuit court as to CAMC is affirmed.

### 2. Liability of Dr. Ayoubi

█ As stated previously, the appellants contend that the minor decedent, Larry, should have been consulted in this case prior to issuance of the "Do Not Resuscitate" order. Consequently, we address the "mature minor" exception to the common law rule that parental consent is required prior to rendering medical treatment to a minor.

> The traditional common law approach to minors and consent to treatment has undergone a number of modifications. Medical emergencies have provided an inroad, permitting treatment without parental consent in certain situations. The 'mature minor' and 'emancipated minor' rules, in which certain children are considered capable of giving consent, have also gained recognition. Many of these changes have come through case law, but to a certain degree legislative action is accountable for the more enlightened attitude toward the minor and her ability to authorize treatment.

Fay A. Rozovsky, *Consent to Treatment* § 5.2 (2d ed. 1990).

The appellee Ayoubi asserts that the appellant is attempting to improperly change the common law where there is no legislative direction by statute. However, the appellee Ayoubi concedes that under appropriate circumstances, the medical standard of care requires that minors be consulted if they are mature and if the circumstances of the particular case do not militate against such consultation.[9]

In *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982), we reiterated in syllabus point 1 thereto the well-established principle concerning consent to medical procedures: "Except in very extreme cases, a surgeon has no legal right to operate upon a patient without his consent, *nor upon a child without the consent of its parent or guardian.*" *Browning v. Hoffman*, 90 W.Va. 568, 581, 111 S.E. 492, 497 (1922) (emphasis supplied).

In this case, the circuit court's instruction to the jury on this point provided: "Ordinarily, a privately retained physician has no legal right to render or withhold medical treatment to a patient without his consent, *nor upon a child without the consent of his parents.* Under West Virginia law a child is any person under the age of 18 years." (emphasis supplied) Obviously, the circuit court's instruction followed the principle enunciated in *Browning*.

Although we believe that the *Browning* principle with respect to the consent of minors remains a sound statement of law, a more workable approach would be recognition that minors who are mature may be involved in the medical decisions that affect their livelihood. As Dean Pound has stated: "The law must be stable, but it must not stand still." Roscoe Pound, *Introduction to the Philosophy of Law* (1922).

One of the first reported cases involving a mature minor exception to the general

---

8. Liability may be imposed on a hospital where the patient did not choose the treating doctor, but is forced to rely on the hospital's choice. "Where a patient goes to a hospital seeking medical services and is forced to rely on the hospital's choice of physician to render those services, the hospital may be found vicariously liable for the physician's negligence." Syl. pt. 2, *Thomas v. Raleigh General Hospital*, 178 W.Va. 138, 358 S.E.2d 222 (1987). *See also* syl. pt. 1, *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991) (Hospital is estopped from denying that its emergency room physicians and other medical personnel are its agents where the hospital makes emergency room treatment available to serve the public as an integral part of its facilities.).

9. The appellee Ayoubi also contends that the issue of whether Larry should have been consulted has been waived by the appellants because it was not argued as a legal issue in the court below. We do not agree with this assessment. The appellants did offer an instruction stating that the standard of care required the consent of not only the appellants, but of Larry as well.

common law rule requiring parental consent to medical treatment of minors was in the 1906 decision in *Bakker v. Welsh*, 144 Mich. 632, 108 N.W. 94 (1906), wherein the Supreme Court of Michigan held that a surgeon was not liable to a father for performing an operation to remove an ear tumor on a seventeen-year-old boy where the boy's father had not given consent and the boy died during the administration of anesthetic. Although it is not clear exactly who gave the consent to surgery, the boy was accompanied by an aunt and a sister, and "they all understood an operation should be performed the following day." *Id.* 108 N.W. at 95.

A more recent delineation of the mature minor rule has come from the Supreme Court of Tennessee in *Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn.1987). In that case, Tennessee's highest court adopted the mature minor exception to the general common law rule requiring parental consent to medical treatment of minors. In *Cardwell*, a young woman, seventeen years and seven months old, went to see the defendant doctor on her own initiative, and without her parent's knowledge, seeking relief from back pain. The defendant did not inquire about parental consent prior to rendering manipulative therapy because he believed, based upon the young woman's demeanor, that she was of age, and also that she had sought his treatment because he had previously treated her father. The parents of the young woman brought an action

against the defendant after complications from the treatment arose. Following appeals from the lower courts, the Supreme Court of Tennessee held that the defendant could not be held liable on a theory of battery for failing to obtain the consent of the minor's parents.[10]

In determining the capacity, and ultimately the maturity of a minor, the court in *Cardwell* stated:

> Whether a minor has the capacity to consent to medical treatment depends upon the age, ability, experience, education, training, and degree of maturity or judgment obtained by the minor, as well as upon the conduct and demeanor of the minor at the time of the incident involved. Moreover, the totality of the circumstances, the nature of the treatment and its risks or probable consequences, and the minor's ability to appreciate the risks and consequences are to be considered.

*Cardwell*, 724 S.W.2d at 748.

In adopting the mature minor exception, the Tennessee court acknowledged that that state's legislature has enacted several provisions concerning medical treatment of minors without parental consent, such as treatment for drug abuse and venereal disease.

Similarly, in this case, the appellee Ayoubi contends that because this state's legislature has spoken to the same type of exceptions, then this indicates a legislative intent to reject the mature minor rule.[11]

---

**10.** The appellee Ayoubi points out that *Cardwell* involved *consent* to treatment of the mature minor as opposed to *assent*, that is, affirmatively seeking treatment instead of merely allowing treatment to be administered or withheld. We believe that this distinction is inapposite for purposes of our recognition of the mature minor exception to the common law rule. Our holding herein applies to not only procedures performed, but treatment administered and withheld as well.

**11.** *See, e.g., W.Va.Code,* 16–4–10 [1971] (allowing treatment of minor for venereal disease without parental consent); *W.Va.Code,* 60–6–23 [1977] (allowing treatment of minor for addiction to or dependency on alcohol without parental consent); and *W.Va.Code,* 60A–5–504(e) [1973] (allowing treatment of minor for addiction to or dependency on controlled substance

without parental consent). *See also W.Va.Code,* 16–30–3(a) [1991] (allowing a competent person "eighteen years of age or older" to execute a living will); and *W.Va.Code,* 16–30A–2(b) [1990] (recognizing that "capable adult" may execute a medical power of attorney).

We note that the legislature has already spoken to the treatment of minors in emergency situations where parental consent is not obtained. *W.Va.Code,* 16–4C–17 [1984] provides, in relevant part:

> No emergency medical services personnel may be subject to civil liability, based solely upon failure to obtain consent in rendering emergency medical services to any individual regardless of age where the patient is unable to give his consent for any reason, including minority, and where there is no other person reasonably available who is legally authorized to consent to the providing of such care or

We do not agree. Rather, we agree with the Tennessee *Cardwell* court's answer to this assertion. "We do not think that the conclusion that these statutes are intended to abrogate judicial adoption of an exception to the general common law rule requiring parental consent to treat minors can be supported by the express terms of any of these provisions." 724 S.W.2d at 744. Rather, that court found "no indication in any of the statutes of any intent on the part of the Legislature to establish a comprehensive statutory scheme to occupy the area of medical treatment of minors *in its entirety." Id.* (emphasis supplied) The court went on to point out that the statutes where the legislature has expressly provided for only consent by the minor "do no more than provide conditional immunities from certain types of liability in specific situations (where such immunities were not otherwise clear in the law) or promote certain social purposes, such as treatment of drug abuse or venereal disease in minors." *Id.*

We agree with the holding of *Cardwell,* and we believe that the mature minor exception is part of the common law rule of parental consent of this state. It is difficult to imagine that a young person who is under the age of majority, yet, who has undergone medical treatment for a permanent or recurring illness over the course of a long period of time, may not be capable of taking part in decisions concerning that

treatment.[12] Clearly, this would be a matter for the jury to decide, and not for this Court to speculate.

However, we believe that this must also be tempered by a recognition that there is no "hard and fast" rule that would provide a particular age for determining a mature minor.[13]

As the Tennessee court cautioned in *Cardwell,* "[a]doption of the mature minor exceptions to the common law rule is by no means a general license to treat minors without parental consent and its application is dependent on the facts of each case. It must be seen in the context of the tort in question." *Cardwell,* 724 S.W.2d at 745.

We are aware that this is a very difficult area of the law when put into practice, especially in light of the age-old principle that "hindsight is 20/20." Furthermore, it is obvious that this places the doctor in the difficult position of making the determination of whether the minor at issue is mature. We recognize the delicate nature of this position, and that the decision by the doctor on the maturity level of a minor will often be second-guessed. Consequently, the doctor, as in every other decision with which he or she is faced, must exercise his or her best medical judgment.[14]

However, in spite of the difficulty brought on by this issue, we agree with the observation that "the answer will be found in *statutory* laws of consent that incorpo-

who is legally authorized to refuse to consent to the providing of such care.

**12.** It has been observed:

Children today are more 'streetwise' and knowledgeable than children were even a few decades ago. Some children of very tender years exposed to continuous types of care are able to give or refuse consent. They may be far more skilled at discussing the pros and cons, the risks and benefits of bone marrow transplants or chemotherapy than a first-year medical student. However, there are also teenagers and young adults who lack the maturity to understand the risks of pregnancy from casual sex and the importance of contraception.

Rozovsky, *supra* § 5.2.2, at 265.

**13.** In *Cardwell,* the court discussed the so-called "Rule of Sevens," which is often applied in the

area of tort liability. Recently, this Court discussed the "Rule of Sevens" as it applied to the law of negligence. Syl. pts. 1–3, *Pino v. Szuch,* 185 W.Va. 476, 408 S.E.2d 55 (1991) (child under age of seven conclusively presumed incapable of negligence; rebuttable presumption that child between seven and fourteen is incapable of negligence; and child fourteen or older is presumed capable of negligence). While this rule may be instructive as a starting point in determining minor maturity, the ultimate determination will vary from case to case.

**14.** This case is another of many illustrations of the need for good record-keeping in the medical profession. Needless to point out, once the doctor has determined that the minor is mature, this determination should be duly noted as part of the patient's records. In this type of case, there is little room for variations in progress notes and treatment orders, such as the notation disputed in this case. *See* note 2 *supra.*

rate an element of the mature minor rule." Rozovsky, *supra* § 5.2.2, at 265 (emphasis supplied). Accordingly, our holding in this case is nothing more than a recognition that the mature minor exception to the common law rule of parental consent in this state exists. The legislature, of course, may, by statute, prohibit recognition of the principles enunciated herein.[15]

Obviously, application of the mature minor rule would vary from case to case. The focus would be on the maturity level of the minor at issue, and whether that minor has the capacity to appreciate the nature and risks involved of the procedure to be performed, or the treatment to be administered or withheld. "In current practice, judicial application of the 'mature minor' exception where an objective appraisal of the circumstances indicates that the minor was informed and understood the nature and consequences of the procedure in question." Lawrence P. Wilkins, *Children's Rights: Removing the Parental Consent Barrier to Medical Treatment of Minors*, 1975 Ariz.St.L.J. 31, 52 (1975).

▮▮▮ Accordingly, we hold that except in very extreme cases, a physician has no legal right to perform a procedure upon, or administer or withhold treatment from a patient without the patient's consent, nor upon a child without the consent of the child's parents or guardian, unless the child is a mature minor, in which case the child's consent would be required. Whether a child is a mature minor is a question of fact. Whether the child has the capacity to consent depends upon the age, ability, experience, education, training, and degree of maturity or judgment obtained by the child, as well as upon the conduct and demeanor of the child at the time of the procedure or treatment. The factual determination would also involve whether the minor has the capacity to appreciate the nature, risks, and consequences of the medical procedure to be performed, or the treatment to be administered or withheld. Where there is a conflict between the intentions of one or both parents and the minor, the physician's good faith assessment of the minor's maturity level would immunize him or her from liability for the failure to obtain parental consent. To the extent that *Browning v. Hoffman*, 90 W.Va. 568, 111 S.E. 492 (1922) and its progeny are inconsistent herewith, it is modified.

▮▮▮ In this case, the appellee Ayoubi contends that the question of whether Larry should have consented to the withholding of treatment need not even be reached because there was *expert testimony* that Larry was not mature enough to give such consent. While we make no decision on whether such evidence was sufficient to support the appellee Ayoubi's claim in this regard, the circuit court's error was the failure to instruct the jury that it could consider Larry's maturity level in deciding whether, as a matter of fact, Larry was mature so as to consent to his medical treatment.

Accordingly, we reverse the judgment of the circuit court on the liability of Dr. Ayoubi, and remand this case to that court so that, consistent with our adoption of the mature minor exception to the common law rule of parental consent to the medical treatment of minors, it may try the issue of whether Larry came within this exception so as to be entitled to consent to the treatment involved.

### III.

In summary, the judgment of the Circuit Court of Kanawha County is affirmed for reasons stated in this opinion in section II(A) with respect to the circuit court's refusal to allow admission of the proffered rebuttal evidence; and section II(B)(1) with respect to the judgment of no liability on the part of CAMC.

---

**15.** We note that under *W.Va.Code*, 49–7–27 [1977], "[a] child over the age of sixteen may petition a [circuit] court to be declared emancipated." If such petition is granted, "[a]n emancipated child shall have all of the privileges, rights and duties of an adult[.]"

Other states have legislation which actually provides the mature minor exception which we today recognize. *See* Ark.Code Ann. § 20–9–602(7) [Michie 1981]; Miss.Code Ann. § 41–41–3(h) [1984].

The judgment of the Circuit Court of Kanawha County is reversed, however, for reasons stated in section II(B)(2), with respect to the mature minor exception, and this case is remanded.[16]

Affirmed, in part, reversed, in part, and remanded.

**16.** We decline to address assignments of error concerning other instructions inasmuch as they are without merit.