DAVID T. PROSSER, J.
¶ 10. (concurring). The Per Curiam opinion concludes that this case is moot. It further concludes that, although the case raises issues of great public importance and presents a situation likely to repeat itself yet evade appellate review, the court should not proceed to exercise its discretion to take up issues that ought, if possible, to be decided by the legislature. I strongly agree with this decision. I write separately to supplement the explanation of why further court action at this time would be premature and undesirable.
I
¶ 11. In considering this case, the court is not fully apprised about the present status of Sheila W Thus, the case is being reviewed on facts that are more than a year old.
¶ 12. In the early months of 2012, Sheila W (Sheila), then 15, was diagnosed with aplastic anemia, a life-threatening illness in which a person's immune system attacks the person's bone marrow, preventing *680 the body from producing new blood cells. Sheila had received treatment for her condition at the University of Wisconsin Hospital in Madison, and she was taking immunosuppressant drugs without objection. Sheila's doctors determined, however, that Sheila needed blood transfusions and that if she did not have them, her condition would become dire. Her red blood cell, white blood cell, and platelet counts were very low, and she was at risk of serious infection, spontaneous hemorrhage, and cardiac arrest. Dr. Christian Capitini, a pediatric hematologist who was Sheila's attending physician, informed Sheila that without blood transfusions, she would die.
¶ 13. Sheila's parents refused to consent to blood transfusions. Sheila and her family were Jehovah's Witnesses[1] who believed that God prohibits blood transfusions. The parents indicated to their daughter that they believed she was mature enough to make her own decision to accept or refuse blood transfusions, and they informed her that if she decided to accept blood transfusions, they would support her decision. However, the parents would not personally consent.
¶ 14. Sheila refused to consent to the transfusions, citing a Biblical passage from Acts 15:28 and 29. She told Dr. Capitini that she "would rather die not receiving the transfusions than survive, but have the stigma of having received a transfusion." She told Cheryl Bradley, a child protection worker for Dane County, that she would not consent to a blood transfusion under any circumstances, even in the face of death. *681 She told Dane County Circuit Judge William Foust that a blood transfusion would be "devastating to me mentally and physically" because it is "my body, my belief, my wishes." She considered a blood transfusion equivalent to "rape."
¶ 15. On March 1, 2012, Dane County filed a petition for protection or services for Sheila under Wis. Stat. § 48.255 and a petition for temporary physical custody under Wis. Stat. § 48.205. The following day, the Dane County Circuit Court conducted a hearing at University Hospital. After receiving testimony, the court sua sponte appointed a temporary guardian for Sheila under Wis. Stat. § 54.50. The guardian was given authority to decide whether to consent to the recommended medical treatment. The guardian consented, and an undetermined number of blood transfusions were administered to Sheila. The court's guardianship order expired 60 days after March 2, 2012, and was not extended. The expiration of the order is the principal reason this case is moot.
II
¶ 16. In this review, Sheila asks the court to disregard mootness and to recognize the "mature minor doctrine" as part of Wisconsin law. Sheila describes the mature minor doctrine as an exception to the general rule requiring parents to give consent to medical treatment for their children. Under the doctrine, older minors can be permitted to independently make medical treatment decisions involving their own care if they demonstrate "sufficient understanding and appreciation of the nature and consequences of treatment despite their chronological age." Fay A. Rozovsky, Consent to Treatment: A Practical Guide, § 5.01 [B] [3] (4th ed. 2012). The court's recognition of the mature minor *682 doctrine would presumably enable Sheila to refuse any future blood transfusions regardless of the consequences.
¶ 17. The parties acknowledge that states have come to different conclusions about the mature minor doctrine. A number of states have adopted some form of the doctrine, but there is little consistency about how to determine when a minor is "mature" and the full extent of the decisions to which that "maturity" may apply.
¶ 18. Several states have recognized the "rights" of mature minors by statute. See, e.g., Arkansas (Ark. Code Ann. § 20-9-602(7) (2012)); New Mexico (N.M. Stat. Ann. § 24-7A-6.1.C. (1997)); South Carolina (S.C. Code Ann. § 63-5-340 (2010)); and Virginia (Va. Code Ann. § 63.2-100.2. (2012)). But care must be taken not to misread some of these statutes. For instance, the South Carolina statute provides:
Any minor who has reached the age of sixteen years may consent to any health services from a person authorized by law to render the particular health service for himself and the consent of no other person shall be necessary unless such involves an operation which shall be performed only if such is essential to the health or life of such child in the opinion of the performing physician and a consultant physician if one is available.
S.C. Code Ann. § 63-5-340 (2010) (emphasis added). It is not clear from this statute whether a minor who has reached the age of 16 years may refuse lifesaving services, especially if those services are authorized by a parent or by a court. A provision of South Carolina's Death with Dignity (or Right to Die) Act, S.C. Code Ann. § 44-77-30 (2002), permits a person to adopt a written declaration that life-sustaining procedures may *683 be withheld, but only if the person is 18 years of age or older. Consequently, while South Carolina "recognizes" the rights of mature minors by statute, the statute is not as far-reaching as the doctrine that Sheila proposes here.
¶ 19. By contrast, New Mexico's statute appears to be very far-reaching and to cover Sheila's 2012 circumstances. The pertinent statute reads:
Subject to the provisions of Subsection B of this section, if an unemancipated minor has capacity sufficient to understand the nature of that unemancipated minor's medical condition, the risks and benefits of treatment and the contemplated decision to withhold or withdraw life-sustaining treatment, that unemancipated minor shall have the authority to withhold or withdraw life-sustaining treatment.
N.M. Stat. Ann. § 24-7A-6.1.C. (1997). If this statute had been in effect last year in Wisconsin, Sheila would now likely be dead.
¶ 20. There also are a number of court decisions that have adopted some form of the mature minor doctrine. See, e.g., Kozup v. Georgetown Univ., 851 F.2d 437, 439 (D.C. Cir. 1988); People v. E.G., 549 N.E.2d 322, 325 (Ill. 1989); Younts v. St. Francis Hosp. & Sch. of Nursing, 469 P.2d 330, 338 (Kan. 1970); In re Swan, 569 A.2d 1202, 1205 (Me. 1990); In re Rena, 705 N.E.2d 1155, 1157 (Mass. App. Ct. 1999); Bakker v. Welsh, 108 N.W. 94, 96 (Mich. 1906); Gulf & Ship Island R.R. Co. v. Sullivan, 119 So. 501, 502 (Miss. 1928); Cardwell v. Bechtol, 724 S.W.2d 739, 748-49 (Tenn. 1987); Belcher v. Charleston Area Med. Ctr., 422 S.E.2d 827, 837-38 (W. Va. 1992). The substance of these decisions is not uniform. To illustrate, the Tennessee Supreme Court adopted the so-called Rule of Sevens, which provides *684 that children under the age of 7 have no capacity to consent to medical treatment, children between the ages of 7 and 14 have a rebuttable presumption of no capacity, and children between the ages of 14 and the age of majority possess a rebuttable presumption of capacity. Cardwell, 724 S.W.2d at 745.
¶ 21. In 2009 the Supreme Court of Canada exhaustively considered the mature minor doctrine in a case similar to the one before us. A.C. v. Manitoba, [2009] 2 S.C.R. 181 (Can.). In A.C., the statutory law in Manitoba recognized a mature minor's views with respect to her own health care but authorized the Director of Child and Family Services to seek treatment for a child whom the director believed did not understand or appreciate the consequences of the child's decision. The subject of the case was admitted to a hospital when she was 14 years, 10 months old, suffering from internal bleeding caused by Crohn's disease. Id., para. 5. She was a devout Jehovah's Witness, id., who previously had signed an advance medical directive containing her written instructions not to be given blood under any circumstances. Id., para. 6. Her doctor believed that internal bleeding created an imminent risk of death. Id., para. 11. Nevertheless, A.C. refused to consent to a blood transfusion. Id., para. 7.
¶ 22. A brief psychiatric assessment took place at the hospital on the night after the young woman's admission. Id., para. 6. The Director of Child and Family Services determined her to be a child in need of protection, and sought a treatment order from the court under section 25(8) of the Manitoba Child and Family Services Act, under which the court may authorize treatment that it considers to be in the child's best interests. Id., paras. 8-9. Section 25(9) of the Act presumes that the best interests of a child 16 or over *685 will be most effectively promoted by allowing the child's views to be determinative, unless it can be shown that the child does not understand the decision or appreciate its consequences. Id., para. 9. Where the child is under 16, however, no such presumption exists. See id. As a result, the local court ordered that A.C. receive blood transfusions, concluding that "when a child is under 16 years old, there are no legislated restrictions ... on the court's ability to order medical treatment in the child's best interests." Id., para. 12 (internal quotation marks omitted). A.C. and her parents appealed the order, arguing that the legislative scheme was unconstitutional because it unjustifiably infringed A.C.'s rights under the Manitoba statute and the Canadian Charter of Rights and Freedoms. Id., para. 14. The Court of Appeal upheld the constitutional validity of the challenged provisions as well as the treatment order. See id., paras. 15-20.
¶ 23. Writing for a majority of the Supreme Court, Justice Rosalie Abella made the following observations:
The application of an objective "best interests" standard to infants and very young children is uncontroversial. Mature adolescents, on the other hand, have strong claims to autonomy, but these claims exist in tension with a protective duty on the part of the state that is also justified.
In the vast majority of situations where the medical treatment of a minor is at issue, his or her life or health will not be gravely endangered by the outcome of any particular treatment decision. . ..
Where a young person comes before the court under s. 25 of the Child and Family Services Act, on the *686 other hand, it means that child protective services have concluded that medical treatment is necessary to protect his or her life or health, and either the child or the child's parents have refused to consent. In this very limited class of cases, it is the ineffability inherent in the concept of "maturity" that justifies the state's retaining an overarching power to determine whether allowing the child to exercise his or her autonomy in a given situation actually accords with his or her best interests. The degree of scrutiny will inevitably be most intense in cases where a treatment decision is likely to seriously endanger a child's life or health.
The more a court is satisfied that a child is capable of making a mature, independent decision on his or her own behalf, the greater the weight that will be given to his or her views when a court is exercising its discretion under s. 25(8)... . Such an approach clarifies that in the context of medical treatment, young people under 16 should be permitted to attempt to demonstrate that their views about a particular medical treatment decision reflect a sufficient degree of independence of thought and maturity.
. . . When applied to adolescents, therefore, the "best interests" standard must be interpreted in a way that reflects and addresses an adolescent's evolving capacities for autonomous decision making. It is not only an option for the court to treat the child's views as an increasingly determinative factor as his or her maturity increases, it is, by definition, in a child's best interests to respect and promote his or her autonomy to the extent that his or her maturity dictates.
A.C., 2 S.C.R. 181, paras. 82, 85-88.
¶ 24. The authorities cited above, including the decision of the Supreme Court of Canada, reveal the seriousness that should be afforded to Sheila's position. But her position may not represent the majority view in Wisconsin and it may not represent sound public policy. *687 Asking this court to enshrine Sheila's view into our law is asking the court to make profoundly important policy determinations about the rights of minors as well as the role of parents and the role of the state without statutory guidance. It is asking this court to make up the law on its own initiative. Courts need not and should not leap into controversies that may upset longstanding legal principles unless their involvement is unavoidable. This court's involvement is not unavoidable today.
Ill
¶ 25. There are specific reasons why the court is correct in not acting now.
¶ 26. First, unlike Canada and several states, Wisconsin has not codified a mature minor doctrine into its statutory law. However, Wisconsin does have a statute on advance directives to physicians, Wis. Stat. § 154.03(1) ("Any person of sound mind and 18 years of age or older may at any time voluntarily execute a declaration. .. authorizing the withholding or withdrawal of life-sustaining procedures or of feeding tubes"), and a statute on Power of Attorney for Health Care that specifically provides that "[a]n individual who is of sound mind and has attained age 18 may voluntarily execute a power of attorney for health care." Wis. Stat. § 155.05(1) (emphasis added). By incorporating the adult age of 18 into these statutes, the legislature appears to have made a policy choice that is relevant to the present case.
¶ 27. Counsel have not briefed the applicability, if any, of any provision of Wis. Stat. § 51.61.
¶ 28. Second, the court is reviewing this case against the backdrop of State v. Neumann, 2013 WI 58, 348 Wis. 2d 455, 832 N.W.2d 560, in which the court *688 upheld the convictions of Dale and Leilani Neumann for second-degree reckless homicide in the death of their 11-year-old daughter Kara. Kara died from diabetic ketoacidosis resulting from untreated juvenile onset diabetes mellitus. Id., ¶ 1. Her parents were concerned about Kara's health and prayed for her recovery, but they never tried to secure medical treatment for her. After Kara died, her parents were prosecuted for second-degree reckless homicide. Id.
¶ 29. Although I disapproved of the parents' neglect, I dissented from their convictions under the second-degree reckless homicide statute because I thought the statutory scheme was "very difficult to understand and almost impossible to explain." Id., ¶ 213 (Prosser, J., dissenting). The statutory scheme presented notice issues to potential defendants, including the question of when a failure to act amounts to reckless conduct. The court said the answer to when a failure to act amounts to reckless conduct is when the failure violates a "legal duty." Id., ¶ 94.
¶ 30. The majority in Neumann had no problem determining that the Neumanns violated a "legal duty" to provide medical care to their daughter. Against that background, what is the parental duty here? Sheila's parents refused to consent to lifesaving blood transfusions for their daughter. Would Sheila's parents have escaped criminal responsibility if Sheila had died from not receiving blood transfusions if the parents claimed that they had delegated medical decision-making to their daughter? Stated differently, does a state's adoption of a mature minor doctrine relieve parents of whatever duty they have to provide medical care to their "mature" children? These questions have not been briefed, and, in my view, the court is unprepared to answer them.
*689 ¶ 31. Third, permitting a minor to refuse lifesaving medical treatment comes uncomfortably close to permitting a minor to commit suicide.
¶ 32. Wisconsin law provides that, "[w]hoever with intent that another take his or her own life assists such person to commit suicide is guilty of a Class H felony." Wis. Stat. § 940.12 (emphasis added). At first glance, this statute would not appear to be implicated in a situation where a minor is permitted to refuse blood transfusions. In such a case, a potential defendant would not normally have the purpose that the minor commit suicide. However, the phrase "with intent that" also means a defendant was aware that his or her conduct was practically certain to cause (the minor) to commit suicide.
¶ 33. What is suicide? On this point, Sheila's doctors did not believe that she had a terminal illness. Assuming that she is still alive, her doctors were correct. But Sheila's attending physician predicted that she would die without blood transfusions. There was no alternative treatment to preserve her life. Refusing to agree to the only known treatment to save one's life is suicidal unless a person's condition is terminal.[2] Facilitating suicidal conduct in these circumstances is practically certain to cause the person's death.[3] Here, the "person" is a minor.
*690 ¶ 34. The mature minor doctrine anticipates that the state will take steps to assure that a minor has the maturity and understanding to knowingly, intelligently, and voluntarily make the decision whether to act to preserve her own life. This is likely to put courts in the unenviable position of either prohibiting or permitting a minor's suicidal conduct.
¶ 35. Courts are often obligated to enforce law that they may not approve. They are not obligated to create law that they do not approve. To my mind, it is not sound public policy to force courts to give their imprimatur to a minor's commitment to martyrdom.
¶ 36. Finally, Sheila told her attending physician that she would rather die than endure the "stigma of having received a transfusion."
¶ 37. According to the American Red Cross, 30 million blood components are transfused each year in the United States. Am. Red Cross, Blood Facts and Statistics, http://www.redcrossblood.org./learn-aboutblood/blood-facts-and-statistics (last visited June 27, 2013). These blood components are received by approximately 5 million patients from more than 9 million donors. Id. There is little stigma attached to blood transfusions among the population at large, although there is often concern about the safety of the blood supply.
¶ 38. Jehovah's Witnesses are one of the most notable exceptions. They consider the issue of blood transfusions to be "a religious issue rather than a medical one. Both the Old and New Testaments clearly command us to abstain from blood." Watch Tower Bible and Tract Society of Pa., Why Don't You Accept Blood Transfusions ?, http://www.jw.org/en/jehovahs-witnesses/ faq/ jehovahs-witnesses-why-no-blood-transfusions/(citing Genesis 9:4; Leviticus 17:10; Deuteronomy 12:23; *691 Acts 15:28, 29) (last visited June 27, 2013). Some Jehovah's Witnesses have been accused of disfellowshipping, even shunning, members who consent to blood transfusions. See Osamu Muramoto, Bioethical aspects of the recent changes in the policy of refusal of blood by Jehovah's Witnesses, Brit. Med. J., Jan. 6, 2001 at 37-39. The court is not in a position to evaluate these accusations on the evidence before us. However, the existence of these accusations inevitably raises questions about whether a minor's decision to refuse blood transfusions —at the risk of her own death — is truly a voluntary decision when the minor is a Jehovah's Witness.
¶ 39. The issues raised in this writing will be no easier for the legislature than for this court. But the court ought to defer to the principal lawmaking branch of government before it tries to make policy on its own initiative.
¶ 40. For the foregoing reasons, I respectfully concur.

 According to the annual report of Jehovah's Witnesses, there were approximately 7.8 million active members, or "publishers," worldwide in 2012, with roughly 1.2 million members in the United States. Watch Tower Bible and Tract Society of Pa., 2013 Yearbook of Jehovah's Witnesses, 178, 186, 190 (2013).

 See Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 293 (1990) (Scalia, J., concurring) ("American law has always accorded the State the power to prevent, by force if necessary, suicide — including suicide by refusing to take appropriate measures necessary to preserve one's life").

 Cf. Lenz v. L.E. Phillips Career Dev. Ctr., 167 Wis. 2d 53, 70, 482 N.W.2d 60 (1992) ("It is difficult not to view the withdrawal of artificial feeding as inducing death through starvation and dehydration.").