J. A. NEELY AND WIFE, PLAINTIFFS IN ERROR, vs. J. M. McFAD-DEN, DEFENDANT IN ERROR.

Action on a sealed note, dated December 22d, 1863, and payable twelve months after date. The plaintiffs offered testimony to prove the real consideration of the contract, and that it was not with reference to Confederate States notes. The presiding Judge ruled the testimony out. The defendant offered no evidence, and the presiding Judge instructed the jury to reduce the debt according to the scale of values set forth in the " Act to determine the value of contracts made in Confederate States notes or their equivalent." *Held*, that there was error, both in the ruling and the instruction.

In an action on a contract made in South Carolina during the late war, where no mention is made on its face of Confederate currency, but payment is called for in "dollars" or "lawful money " alone, the fact that the parties dealt with reference to Confederate currency may be proved by extrinsic evidence.

In such case the terms "dollars" or "lawful money " must receive, in the first instance, their technical and usual construction, and it is for the defendant to show that the parties looked to Confederate currency as the medium of payment.

When it appears that the parties dealt with reference to Confederate currency, the Act aforesaid may be used as evidence of the value of that currency, but it is not final or conclusive. Evidence contradictory of the Act may be resorted to for the same purpose. And in this view, the Act is not in conflict with any constitutional provision.

That the Act fixes the date of the contract as the time at which the value of the Confederate currency is to be ascertained, is no ground of objection to it, that being the rule, independently of the Act, as appears by the decision of the Supreme Court of the United States, in *Thorington* vs. *Smith*, 8 Wal., 1.

BEFORE THOMAS, J., AT CHESTER, SEPTEMBER TERM, 1869.

Writ of error to the Circuit Court. The case was heard upon a report of the Circuit Judge, as follows:

" This case came on for trial at the September Term, 1869.

" The plaintiff offered in evidence a note, under seal, made by the defendant, for $1,345, dated 22d December, 1863, and payable twelve months after date. The handwriting being admitted, the plaintiff closed his case, with the privilege of replying. The defendant offered no testimony, contending that the Act of March 26, 1869, operated immediately to reduce a note made within the periods named in the Act, where it appeared that the note was in the ordinary form, according to the " usual custom of trade." In this position the defendant was sustained by the Court. The plaintiff then offered testimony to prove the real consideration of the contract, and that the contract was not in Confederate States notes, or with reference to Confederate States notes. The Court refused to allow such testimony, as varying a written contract, to go before the jury, and, under such instruction of the Court, the jury found a verdict for the plaintiff, for $136.

" The plaintiff moved for a new trial upon the two grounds of the ruling of the Court above stated, which said motion was refused.

" Which said rulings of the Court the plaintiff assigns and alleges as error.

" 1st. On a motion for a new trial:

" 1. That His Honor erred in deciding that the defendant was not obliged to offer testimony going to show that the contract was in Confederate States notes, or with reference to Confederate States notes.

" 2. That His Honor erred in not allowing the plaintiff to prove the real consideration of the contract.

" And in arrest of judgment:

" 1. That the Act of March 26, 1869, entitled ' An Act to determine the value of contracts made in Confederate States notes or their equivalent ' is void, as being violative of Article I, Section 10, of the Constitution of the United States."

*Hamilton,* for plaintiff in error.

The Act of the General Assembly, approved March 26, 1869, entitled " An Act to determine the value of contracts in Confederate

States notes or their equivalent," was intended merely to establish a rule of evidence.—Acts 1868 and 1869, p. 277. This rule of evidence has been recognized, outside of any express provision by statute, by the Supreme Court of the United States.—*Thorington* vs. *Simth*, 8 Wallace, 1.

The Act of March 26th, 1869, can have no greater scope.

There was manifest error in the ruling of His Honor the Judge, in the above stated case, in deciding that the contract made in 1863 was, by mere operation of the Act of March 26, 1869, immediately diminished without need of proof.

The Ordinance of the Convention of 1865 was a legislative enactment.—Journal of Convention of 1865, p. 177.

That these legislative enactments are everywhere inferentially acknowledged, where not conflicting with the law as at present established.

The Ordinance of 1865 in no wise conflicts with the Act of the General Assembly, approved March 26, 1869.

It applies to an entirely different class of cases, where the contract was evidently made with reference to the value of the property sold, estimated by the value of Confederate currency in gold.

The Act of March 26, 1869, entitled " An Act to determine the value of contracts made in Confederate States notes or their equivalent," is clearly violative of the 1st Art., Sec. 10, of the Constitution of the United States.

The rule to be observed in such cases has been laid down by this Court.— *Goggins* vs. *Turnipseed*, Unpublished Decisions of this Court.

*Hemphill*, contra.

Nov. 26, 1870. The opinion of the Court was delivered by

WILLARD, A. J. The plaintiff sues on a promissory note, dated December, 22d, 1863, payable in twelve months after date. On the trial the defendant introduced no testimony ; but insisted that under the operation of the " Act to determine the value of contracts made in Confederate States notes or their equivalent," passed March 26th, 1869, the debt was reduced to the sum which, according to the scale of values set forth in that Act, was the equivalent in the currency of the United States of the face of the note at its date. The Court sustained this view. The plaintiff, thereupon, offered testimony to prove the real consideration of the contract, and that it was

not with reference to Confederate States notes.   The Court excluded such testimony as varying a written contract, and under such instructions the jury found a verdict for the plaintiff.   It is evident that this verdict must be set aside, unless the proposition is established that all contracts made between the dates to which that Act relates are exclusively controlled thereby, without regard to extrinsic evidence of the real intent of the parties, or the facts of the case, in the following respects: first, that all such contracts are to be held as made in contemplation of Confederate currency; and, second, that the value of Confederate currency is to be determined according to the rule laid down in that Act.

The Act relates to contracts created or contracted in Confederate States notes, or with reference to such notes as a " basis of value," made during the years 1861, 1862, 1863, 1864 and 1865.   It declares that the obligation of such contracts shall be determined by the value of said Confederate States notes in the lawful money of the United States at the time such debts or obligations were created or contracted.   Section 2 commences as follows : "Pursuant to the preceding Section, the value of one dollar of lawful money of the United States in said Confederate States notes is declared as follows, namely ;" then follows a tabular statement of the relative values of such currency during the different months or parts of the year extending through the period of years before mentioned.   This table places the nominal amount of $13.50 of Confederate States notes, on the 1st of December, 1863, at the value of one dollar lawful money of the United States. To ascertain the value of that amount of Confederate notes, on the 22d of December, 1863, the rate of increase during the month of December, as ascertained by comparing the values set down for December 1, 1863, with those for January 1, 1864, must be taken into account, and the value from December 1 actually increased accordingly.

The following questions are to be considered: 1st. Where no mention is made on the face of a contract, of Confederate States notes, but the contract calls for " dollars," or " lawful money," alone, can the fact that the parties dealt with reference to Confederate currency be made out by extrinsic proofs?   2d. When that fact appears, can resort be had to the Act in question as the means of ascertaining the value of such Confederate currency?   3d. Is the Act final and conclusive between the parties, as it regards the class of contracts to which it applies? or may the parties introduce

evidence contradictory of the declarations of the Act as to the true state of relative values ?

I. Can the parties resort to proof outside of that afforded by the instrument itself, to convert an obligation to pay " dollars," or " lawful money," into one to pay according to the value of the notes of the Confederate States? These notes were not lawful money under the Constitution and laws of the United States, and, therefore, could not, as a question of legal conclusion alone, satisfy the expression, " lawful money." It is necessary, therefore, to show, as matter of fact, that where the parties said lawful money, they did not mean that which the law adjudged to be lawful money, but certain promises to pay, having current commercial value, but not answering the description of " lawful money." This question must be looked at both on grounds of substantial justice and of technical law. The object of technical rules is to afford lights by means of which justice may be attained. What is justice, in a legal sense, is determined by the conscience of the community as revealed in the spirit of the laws, and not by the conviction of any single individual mind, however gifted.

In December, 1863, the parties to this controversy resided in the State of South Carolina. The Constitution and laws of the United States, although obligatory upon them, were practically inoperative for the time being. The State of which they were citizens was, in common with certain other States, engaged in making war upon the Government and people of the United States. Though a war in form, it was in effect a rebellion against the sovereignty of the United States. The confederated States assumed, among other things, to exercise national power, to make war, to maintain military forces, to levy taxes and contributions, and to establish standards of values. The gold and silver coin of the United States had ceased to be the actual representative of values in the dealings of these communities, not only in the Confederate States, but throughout the territorial limits of the United States. This was not alone due to its insufficient supply for commercial purposes, but to the additional fact that in that portion of the country maintaining the authority of the United States the paper issues of the Government, made a legal tender, had replaced gold and silver in current transactions, and, as a consequence, the prices of all commodities had adjusted themselves to the nominal value of such issues ; and, as such issues had a relative value as compared with gold and silver, less than its nominal value, commercial dealing

no longer rested upon the standards of coin values. The language of commerce was unchanged in form, the terms that were employed to express the measures of values, as a general thing, still continued in use, but the import and force of those terms had been changed through the legislation that sought to give commercial value to the bills of the Government. In the Confederate States a still more complicated state of facts existed. Here, also, gold and silver coin had ceased to control the values of commodities as dealt in by the communities. The war having destroyed commercial intercourse between the sections of the country, the currency put in circulation by the Government of the United States did not, and could not, enter into the local circulation here to a sufficient extent to influence values. The Confederate States put in circulation obligations which, from the necessity of the case, became the basis of values, determining the prices of commodities dealt in by the people. Here, also, the language of commerce remained unchanged; but the terms intended to express monetary values were, according to the common understanding, assumed to relate to the notes of the Confederacy then in circulation. In December, 1863, if we may assume the correctness of the table to which reference has been made, Confederate currency stood to the United States currency in the ratio of about fourteen to one.

Such was the general state of affairs. Of much we can take judicial notice; of the rest, it has become part of the history of the country, and, as such, forms, at least, a fair basis for testing the principles involved in the present question.

If the parties really understood Confederate currency as the medium of discharging the obligation expressed by the note in suit, then it is apparent that the plaintiff, in recovering the face of the note, would recover many times the value of the consideration that he must be assumed to have parted with in exchange for the note. Such a result would be obviously unjust. The injustice of such a course has been recognized in many cases, involving this question, which have arisen in other States. It remains to be seen whether such injustice is the inevitable consequence of the rules of law by which we are bound.

All technical rules of construction have for their object the discovery of the actual and fair intent of the parties. The best evidence of that intent is the instrument professing to express it. Parties must be deemed to use words according to their ascertained legal effect, or according to common acceptation and usage, and not

according to individual standards. The language of the country is the coinage of the whole people who speak it, and common use, in the absence of a technical standard, must determine its import.

It is, therefore, perfectly correct, in principle, to preclude a party to a contract from saying that he employed words according to a meaning peculiar to himself. What is true of words is equally so of expressions. When parties employ technical formulas to which a definite signification is attached, they are generally, though not universally, intended to have used such expressions according to the received technical sense; but ordinarily the sense must be made out by applying general rules of construction to the language employed. These rules do not look to the mental habits of the individual whose expressions are examined by them, but to the common mind.

It is in harmony with these obvious principles that parties to a written contract are ordinarily held to that proof of their intent which appears on the face of their contract. Applying this rule to the case in hand, if the defendant had, on the trial, offered to prove that, at the time he made and delivered his note, he understood "dollars," or "lawful money," to mean Confederate currency, that proof should have been excluded; but had proof been offered tending to show that what the whole community regarded and dealt with as money was Confederate currency, then the question of the admission or rejection would have directly involved the distinction now under consideration. In the case of the offer first supposed, the attempt would be to construe the contract according to an individual standard, while, in the case last supposed, the inquiry would be as to what, at the time and place of the contract, was the standard according to the common understanding and usage.

The exact question here is, as to the true import of terms used in a contract, with the intention of referring the obligation of that contract to a known money value. It has been already said that there may be two modes of ascertaining the import of these terms, either by referring them to the coinage of the country, the fixed legal standard, or by referring them to the standard of values adopted for the time being by the commerce of the country, or State. Ordinarily these standards are the same, and no question like the present one can arise. Two cases, however, may be conceived, where the commercial standard might differ from the legal: first, where, for the time being, the laws, ascertaining such legal standard of values, are inoperative; and, second, where the medium

of exchange contemplated by such standard is withdrawn from circulation. Both of these causes were operative in the State of South Carolina at the date of the contract under consideration. The question then arises, where such a state of facts actually has existed, that the commercial standard of value differs from the legal, which is to control the import of terms employed in commercial dealings during such exceptional state of affairs?

One or two propositions may assist this enquiry. In the first place, parties are under no legal obligation to employ the legal standards of value at the time and place of contract. They may contract with reference to foreign money, or a medium of exchange not recognized as money by any system of laws. They may base their contracts on pounds sterling, or Mexican dollars, or anything else possessing value capable of being measured, that is to say, of being compared with other objects of known value. Although the policy of laws of this class is to induce uniformity in contracts, they have never attempted to compel it. In the next place, it is not an invariable rule that parties are to be held to be familiar with the technical force and effect of legal terms and expressions.

It is true that a wrong cannot be justified on the ground of ignorance of law. But that is a very different proposition from the one that parties contracting together in terms having a fixed legal signification, are to be held, under all circumstances, bound to intend such signification.

What is meant by a power of attorney is as much the subject of legal ascertainment as what is meant by a lawful dollar, and yet, in *Hunt* vs. *Roasmaineer*, (8 Wheat., 174,) the Supreme Court of the United States reformed a contract, on the ground that the parties, acting under the advice of counsel, had misconceived the import and effect of a power of attorney, and, in view of their real intention, would be regarded as meaning a mortgage where they mentioned a power of attorney as the instrument of effectuating the general object of their contract. Here was an exception to the ordinary rule that parties are to be regarded as intending the legal force and effect of their expressions made out on narrower grounds than the present case affords. In the first place, it had to be brought within the class of mutual mistakes; in the next place, the mistake was not induced by the common understanding and usage of the whole political community, but by the misapprehension of a single legal adviser; and in the last place, the effect was to put the parties in a specifically new relation to the subject-matter of the contract.

In that case a borrower gave a power of attorney to the lender as security for money loaned, the object of the power being the creation of a lien for the security of the money. The borrower died before the power was put in exercise, and it was found to be revoked by his death. The result of the decision was to give to the contract the effect of creating the lien at once, instead of that of merely originating a power which, by due exercise, might be made to produce such lien. It was not, as in the present case, an effort to limit the nominal force of the contract to a fair relation to its consideration, but, on principles of construction, to import a new active energy into the contract itself.

The doctrine of *Garvin* vs. *Garvin*, (1 DeS., 437,) and *Lawrence* vs. *Beaubien*, (2 Bail., 623,) that mutual mistakes of law, induced by mistaken legal advice, may be corrected, could not be upheld if the rule is to prevail that parties are, in all cases, to be bound to have intended the legal consequences of the expressions employed by them according to their technical sense. They certainly recognize an exception to that rule. The principle of these cases would clearly reach to a case where the parties have been controlled in their expressions by the common understanding and usage of the whole community, comprising the political body, from which the laws emanate, and including, as it does, not only all private legal advisers, but the judges who are to speak the voice of the political body itself. If, in point of fact, the whole community united in using the notes of the Confederate States as money, and calling them money, even to the extent of ascertaining commercial values with reference to them as a standard; and it also appears, as either matter of proof or presumption, that the present parties considered that the expressions employed by them would be referred to that commercial standard; and if in all this they have mistaken the law, then it is clear that they have as good justification for such mistake as if it had arisen from the erroneous advice of any one legal gentleman professionally consulted by them.

To arrive at such a conclusion, involves a question of fact proper for submission to a jury. We therefore conclude that it was competent for the defendant, on the trial, to go into proof of extrinsic facts and circumstances of what, at the time of the contract, was commonly used and dealt in by the community as money, in order to show the intent of the parties to a contract calling for the payment of " dollars" as " lawful money."

The extent of evidence to which parties may resort in such cases,

12A

it is not for us to consider. It may be proper now to add that, in addition to such proof as may tend to show what commodity or representative of value fulfilled the part of money in commercial dealings, proof of the value of the consideration may be, in many cases, important as a means of showing according to what standard of values the parties acted. If it should appear, for instance, that the sale of an article of merchandise constitutes the consideration, and it should further appear that the price to be paid reasonably agreed with the market rates for that class and quality of goods, as adjusted to the value of Confederate notes, and it further appeared that, regarded as United States currency, the price agreed to be paid is grossly in excess of the value of the commodity sold, it would lead to the inevitable conclusion that the parties had reference to the actual rather than the legal representative of value current at the time of sale.

Proof of the value of the consideration is not in such cases admissible as affording a basis for reforming the contract, but as showing what the parties intended by the use of the terms "dollars" or "lawful money."

The Act of March 26th, 1869, does not assume to determine what contracts are, nor what contracts are not, based on Confederate notes. Its operation is limited in terms, first, to contracts made within certain years, and, second, to such thereof as were based on the values of Confederate States obligations. The Act does not obviate the necessity of the defendant's showing that the contract falls within its provisions, notwithstanding it was made in one of the enumerated years. Where a note on its face calls for the payment of "dollars," or "lawful money," although made during the enumerated years, yet, in the absence of a finding of fact sufficient to form the basis of a different construction, the law adjudges the established legal currency of the United States to be intended by the parties.

2d. The next question is, whether, when it appears that the parties dealt with reference to the Confederate currency, resort can be had to the Act in question as a means of ascertaining the value of such Confederate currency. This question is intimately connected with the next, namely : Is the Act final and conclusive between the parties, as it regards the class of contracts to which it applies? or, may the parties introduce evidence, contradictory of the declaration of the Act, of the state of relative values?

So far as the Act is reconcilable with the relations between the

parties springing out of the contract in suit, it is obligatory, and cannot be said to impair the obligation of such contract. The question of constitutionality, when presented in any case to a Court, assumes the single form and aspect of an enquiry, whether the particular contract obligations in question are, in point of fact, impaired by the statute.

The proper subject of a legal controversy is not the authority of an Act of legislation, considered as a general question, but the rights of the parties before the Court. Where a question of the constitutionality of a statute actually affects these relations, it must be considered on that ground, and on that alone. We are not to consider, in the present case, the merits or demerits, legal or otherwise, of the means set forth in the Act in question in their relation to contracts at large, based on Confederate currency, but the effect of the Act on the immediate rights of the parties before the Court exclusively.

Section second declares a state of facts as having existed at a particular time. It declares what was the relative value of Confederate States notes and United States currency at the date of the contract, or at least furnishes the means of fixing that relation, according to the principles of the Act. If it had been made to appear, in the present case, that the declaration was not in accordance with the fact, then the question would arise, whether a legislative declaration of a fact could preclude parties to a contract from giving proof of the actual state of the facts under which the extent of the obligation is to be judicially ascertained, without either directly or indirectly impairing the obligation of such contract. No testimony was offered on the trial for the purpose of showing that the actual relative values of the two descriptions of money differed from the declarations of the Act. If the declaration was in accordance with the actual fact, then the contract cannot be prejudicially affected by it, because the rights of the parties are the same under the statute as under the actual state of facts existing. In the absence of proof to the contrary, we are bound to regard the declarations of the Act as conformable to the fact, unless the Legislature was actually precluded from making any declaration on the subject, and the present parties have a right to insist on such want of legislative authority.

It is not our intention to enlarge the authority of that class of cases in which the Supreme Court of the United States has given a construction to the clause of the Constitution of the United States

forbidding States from passing laws impairing the obligation of contracts. The Legislature may rightfully establish rules of evidence, and such rules may be made binding upon antecedent contracts. The limit of this right is, that such rule must not impair the obligation of the contract. It is within the limits of this authority to declare what presumptions shall be made in the absence of proof, and, in the course of· such legislation, the *onus probandi* is shifted from the one party to the other. So long as that results from a rule of general convenience, and is not, in substance, an effort to impair the·obligation of a contract, parties have no right to complain. The declaration, in the present case, relates to matters of public concern, and is intended to save parties litigating from the inconvenience and expense of collecting proof on so difficult and intricate a question. If the parties are dissatisfied with the result of the declaration, they are at liberty to resort to other proof of the real state of the case. We cannot find, either in the Constitution of the United States or of the State, authority for saying that the Legislatûre may not declare the existence of a fact of general interest, and forming part of the public history of the State, so as to justify the Courts in assuming the truth of such fact in the absence of evidence to the contrary. As this case stands, we must conclude that it was competent for the Circuit Court to submit to the jury the provisions of the Act, and, in the absence of proof to the contrary, for the jury to base their conclusions upon the declaration set forth in the several Sections of the Act.

On the other hand, the parties are not precluded from showing that the declaration of the second Section, in its bearing on the present case, is inconsistent with the actual state of facts. We do not regard the Act as assuming to do more than this. If it had intended to bind the parties absolutely to the state of facts declared, it must be assumed, in view of the doubtful character of such legislation, that language would have been employed distinctly expressing such intent.

It is evident, from its carefully guarded language, that it was intended to confer upon it just that amount of authority that could rightfully be conferred by a statutory declaration of a fact of that character, and no more. In our judgment, that rightful authority can only extend to laying down a basis for determining the rights of the parties in the absence of proof of a conclusive character to the contrary ; and, therefore, we must conclude that such was the intent of the Legislature that passed the Act.

The Act in question adopts the date of the contract as the time with reference to which the comparison of relative values is to be made. Independent of this legislative determination, it might be found embarrassing to lay down a uniform rule on this subject. If called upon to consider, *a priori*, the question, whether the conversion of values should have relation to the date of the contract or its maturity, two classes of cases would have to ·be considered, namely, those of obligations maturing while Confederate money possessed commercial value, and those maturing afterwards. But we are not compelled to enter upon this difficult question; for, unless the Act in question is in conflict with the Constitution of the United States, or of this State, in this respect, we must regard the question as settled by legislative authority. The question then arises, is the Act imperative, under the Constitution of the United States, on the ground that, by the statute, the obligation is to be tested by the relative values of the two kinds of currencies at the date of the contract, whereas the contract itself contemplated the value of Confederate money, at the date of payment, as the measure of liability. On a question of this kind, the authority of the Supreme Court of the United States is conclusive. In *Thorington* vs. *Smith*, (8 Wallace, 1,) the conclusion of that Court, on this very question, is stated in the following language: "We are clearly of opinion that the party entitled to be paid in these Confederate dollars can receive their actual value at the time and place of the contract in lawful money of the United States."

It is true that, in that case, the question whether the date or the maturity of the contract was to govern, was of little practical importance, for the note sued upon was payable· one day after date; still there was a theoretical difference, and it would seem that that Court took into consideration that distinction, in order to lay down a general rule, which was done in the language above quoted. We must, therefore, consider the question arising under the Constitution of the United States as settled in favor of the constitutionality of the Act.

Our State Constitution (Art. I, Sec. 21,) contains a similar clause, prohibiting the Legislature from passing any law impairing the obligation of contracts. If this clause is to be considered precisely as if no similar provision existed in the Constitution of the United States, then, in giving effect to it, we would have to regard ourselves as bound by the decision in *Thorington* vs. *Smith*, only so far as that decision rested upon sound reasoning. We are of opinion,

however, that the clause in question, as appearing in our State Constitution, ought to be read in connection with the corresponding clause in the Constitution of the United States, and effect given to both as forming part and parcel of one system of measuring the constitutional powers of the State Legislatures.  It is very evident that if a rule of construction should be applied to that clause, regarded as a part of the Constitution of the United States by the State Courts, following the authority of the Supreme Court of the United States, and another rule of construction should be laid down as applicable to the same expression found in the State Constitution, an inconvenient and contradictory state of the law would arise.   This inconvenience is avoided by reading the clause in the State Constitution as intended for the enforcement of the same rule of duty imposed by the Constitution of the United States.  This is, undoubtedly, the true view of the rule of construction, as applicable to the clause of our domestic Constitution under examination, and it would follow that the construction, settled by the highest judicial authority of the nation, in respect to the effect of the clause in question as occurring in the Constitution of the United States, should be adopted as the basis for construing the same clause as it appears in the State Constitution.

In the consideration of the questions that have been discussed, it has not been found necessary to examine the nature and legal consequences of the authority of the Governments existing in the confederated States, either unitedly or individually, during the rebellion, for the reason that, although the existence of the Confederate obligations depended on the action of the power set up by the Confederate States, still their value and significance, as a medium of exchange and standard of value, depended wholly upon the convenience and action of commerce.   There was and could be but one legal standard, and that was enforced by the Constitution and laws of the United States.   Nor is it of importance whether the convenience of commerce or the power and influence of the Confederate States controlled the use of Confederate currency by the commercial community ; for, in the view that we take of the case, it is the fact that a certain commercial value was ascribed to this currency, and not the motive that led to its ascription, that is decisive.

The Circuit Judge erred in holding that, as matter of law, the amount of the note was to be reduced, under the operation of the statute, having regard simply to the date of the contract, and irre-

spective of the actual intent of the parties. He also erred in excluding testimony of the real consideration of the contract offered on the part of the plaintiff.

The verdict must be set aside, and a new trial ordered.

*Moses*, C. J., and *Wright*, A. J.—We concur in the result.