# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP500 |
| COMPLETE TITLE: | In the interest of Sheila W., a person under the age of 18:<br><br>Dane County,<br>      Petitioner-Respondent,<br>   v.<br>Sheila W.,<br>      Respondent-Appellant-Petitioner. |

---

REVIEW OF A DECISION OF THE COURT OF APPEALS
(No Cite)

---

| | |
|---|---|
| OPINION FILED: | July 10, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 11, 2013 |

---

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Dane |
|   COUNTY: | Circuit |
|   JUDGE: | William C. Foust |

---

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | PROSSER, J., concurs. (Opinion filed.) |
|   DISSENTED: | GABLEMAN, ROGGENSACK, ZIEGLER, JJJ., dissent. (Opinion filed.) |
|   NOT PARTICIPATING: | |

---

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs by *Shelley M. Fite*, assistant state public defender, and oral argument by *Shelly M. Fite*.



For the petitioner-respondent, there was a brief by *Eve M. Dorman*, assistant corporation counsel, and *Dane County*, and oral argument by *Eve M. Dorman*.

2013 WI 63

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2012AP500
(L.C. No.   2012JC55)

STATE OF WISCONSIN          :          IN SUPREME COURT

**In the interest of Sheila W., a person under the age of 18:**

**Dane County,**

          **Petitioner-Respondent,**

     **v.**

**Sheila W.,**

          **Respondent-Appellant-Petitioner.**

**FILED**

**JUL 10, 2013**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1   PER CURIAM.   This is a review of an unpublished opinion of the court of appeals dismissing this appeal because the issues presented are moot.[1]   The petitioner, Sheila W., is a minor who was diagnosed with aplastic anemia.   She opposed on

---

[1] Dane Cnty. v. Sheila W., No. 2012AP500, unpublished slip op. (Ct. App. Oct. 31, 2012).

religious grounds any life-saving blood transfusions and her parents supported her position.

¶2 The circuit court appointed a temporary guardian under Wis. Stat. § 54.50 for the purpose of deciding whether to consent to medical treatment. Sheila W. appealed, but the order appointing a temporary guardian expired while the case was pending before the court of appeals. The court of appeals then dismissed the appeal, concluding that the issues presented are moot and that the appeal does not sufficiently satisfy the criteria to address the merits regardless of mootness. Four issues are presented for our review:

¶3 First, notwithstanding mootness, should this court decide this case on the merits because it involves matters of statewide importance that are capable of repetition yet evade appellate review? Second, does Wisconsin recognize the mature minor doctrine, which may permit a minor to give or refuse consent to medical treatment after a finding that she is sufficiently mature and competent to make the treatment decision? Third, does a mature, competent minor have an enforceable due process right to refuse unwanted medical treatment? Fourth, did the circuit court violate Sheila W.'s common law and constitutional right to refuse unwanted medical treatment by appointing a temporary guardian to determine whether to give consent to medical treatment over her objections?

¶4 We address only the issue of mootness. This court has "consistently adhered to the rule that a case is moot when a

2

determination is sought upon some matter which, when rendered, cannot have any practical legal effect upon a then existing controversy." G.S., Jr. v. State, 118 Wis. 2d 803, 805, 348 N.W.2d 181 (1984). In this case, no determination of this court will have any practical legal effect upon an existing controversy because the order being appealed has expired. There was no request to extend the order and there is no indication that Dane County has sought any additional order to which Sheila W. objects.[2]

¶5 All parties agree with the conclusion of the court of appeals that the issues presented in this case are moot. Like the parties and the court of appeals, we also conclude that the issues presented are moot.

¶6 Sheila W. argues that this court should reach the merits of the issues presented despite the acknowledged mootness. In past cases, this court has addressed moot issues when the issues presented are of "great public importance," or when "the question is capable and likely of repetition and yet

---

[2] Counsel for Dane County observed at oral argument that no "movement" has been made for any additional order:

> But there is nothing in this record to suggest that this is an ongoing problem at this point. For the last year, there has not been, to the best of my knowledge, any movement to subject [Sheila W.] to additional transfusions to which she objects, and to the best of my knowledge she survives.

evades appellate review . . . ."  State ex rel. Angela M.W. v. Kruzicki, 209 Wis. 2d 112, 120 n.6, 561 N.W.2d 729 (1997).[3]

¶7    This case undoubtedly presents issues of great public importance.    Questions  concerning  when  or  if  a  minor  may withdraw consent to life-saving medical treatment are inquiries "bristling with important social policy issues."   Id. at 134. Furthermore,  it  appears  that  orders  appointing  temporary guardians for the purpose of determining whether to consent to life-saving medical care are capable and likely of repetition and yet will evade appellate review.

¶8    In this instance, we deem it unwise to decide such substantial social policy issues with far-ranging implications based on a singular fact situation in a case that is moot.   In Eberhardy v. Circuit Court for Wood Cnty., 102 Wis. 2d 539, 307 N.W.2d 881 (1981), this court was faced with a similar dilemma of whether to yield initially to the legislature on a social policy issue.   In that case the guardians of a mentally-impaired adult  daughter  sought  court  approval  for  her  surgical sterilization.   Id. at 541-42.   The court concluded that because of  the  complexities  of  the  public  policy  considerations involved,  opportunity  should  be  given  to  the  legislature  to

---

[3] For additional discussion of mootness and its exceptions, see, e.g., State v. Schulpius, 2006 WI 1, 287 Wis. 2d 44, 707 N.W.2d 495; Sauk Cnty. v. Aaron J.J., 2005 WI 162, 286 Wis. 2d 376, 706 N.W.2d 659; State ex rel. Riesch v. Schwarz, 2005 WI 11, 278 Wis. 2d 24, 692 N.W.2d 219; State v. Morford, 2004 WI 5, 268 Wis. 2d 300, 674 N.W.2d 349; City of Racine v. J-T Enterprises of America, Inc., 64 Wis. 2d 691, 221 N.W.2d 869 (1974).

conduct hearings and undertake the necessary fact-finding studies that would result in measured public policy along with statutory guidelines. Id. at 542. The court explained:

> The legislature is far better able, by the hearing process, to consider a broad range of possible fact situations. It can marshal informed persons to give an in-depth study to the entire problem and can secure the advice of experts . . . to explore the ramifications of the adoption of a general public policy . . . .

Id. at 570-71.

¶9 For the same reasons enunciated in Eberhardy, we decline at this time to exercise the court's discretion to address the moot issues presented in this case.[4] Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is *affirmed.*

---

[4] As the court stated in Eberhardy in yielding to legislative action, it should not be construed that "this court abrogates its own authority and jurisdiction to act on this subject at a future time if it becomes apparent that the legislature is unable or unwilling to act." Eberhardy v. Circuit Court for Wood Cnty., 102 Wis. 2d 539, 578, 307 N.W.2d 881 (1981).

¶10 DAVID T. PROSSER, J. *(concurring).* The Per Curiam opinion concludes that this case is moot. It further concludes that, although the case raises issues of great public importance and presents a situation likely to repeat itself yet evade appellate review, the court should not proceed to exercise its discretion to take up issues that ought, if possible, to be decided by the legislature. I strongly agree with this decision. I write separately to supplement the explanation of why further court action at this time would be premature and undesirable.

I

¶11 In considering this case, the court is not fully apprised about the present status of Sheila W. Thus, the case is being reviewed on facts that are more than a year old.

¶12 In the early months of 2012, Sheila W. (Sheila), then 15, was diagnosed with aplastic anemia, a life-threatening illness in which a person's immune system attacks the person's bone marrow, preventing the body from producing new blood cells. Sheila had received treatment for her condition at the University of Wisconsin Hospital in Madison, and she was taking immunosuppressant drugs without objection. Sheila's doctors determined, however, that Sheila needed blood transfusions and that if she did not have them, her condition would become dire. Her red blood cell, white blood cell, and platelet counts were very low, and she was at risk of serious infection, spontaneous hemorrhage, and cardiac arrest. Dr. Christian Capitini, a

1

pediatric hematologist who was Sheila's attending physician, informed Sheila that without blood transfusions, she would die.

¶13 Sheila's parents refused to consent to blood transfusions. Sheila and her family were Jehovah's Witnesses[1] who believed that God prohibits blood transfusions. The parents indicated to their daughter that they believed she was mature enough to make her own decision to accept or refuse blood transfusions, and they informed her that if she decided to accept blood transfusions, they would support her decision. However, the parents would not personally consent.

¶14 Sheila refused to consent to the transfusions, citing a Biblical passage from Acts 15:28 and 29. She told Dr. Capitini that she "would rather die not receiving the transfusions than survive, but have the stigma of having received a transfusion." She told Cheryl Bradley, a child protection worker for Dane County, that she would not consent to a blood transfusion under any circumstances, even in the face of death. She told Dane County Circuit Judge William Foust that a blood transfusion would be "devastating to me mentally and physically" because it is "my body, my belief, my wishes." She considered a blood transfusion equivalent to "rape."

---

[1] According to the annual report of Jehovah's Witnesses, there were approximately 7.8 million active members, or "publishers," worldwide in 2012, with roughly 1.2 million members in the United States. Watch Tower Bible and Tract Society of Pa., 2013 Yearbook of Jehovah's Witnesses, 178, 186, 190 (2013).

¶15 On March 1, 2012, Dane County filed a petition for protection or services for Sheila under Wis. Stat. § 48.255 and a petition for temporary physical custody under Wis. Stat. § 48.205. The following day, the Dane County Circuit Court conducted a hearing at University Hospital. After receiving testimony, the court sua sponte appointed a temporary guardian for Sheila under Wis. Stat. § 54.50. The guardian was given authority to decide whether to consent to the recommended medical treatment. The guardian consented, and an undetermined number of blood transfusions were administered to Sheila. The court's guardianship order expired 60 days after March 2, 2012, and was not extended. The expiration of the order is the principal reason this case is moot.

II

¶16 In this review, Sheila asks the court to disregard mootness and to recognize the "mature minor doctrine" as part of Wisconsin law. Sheila describes the mature minor doctrine as an exception to the general rule requiring parents to give consent to medical treatment for their children. Under the doctrine, older minors can be permitted to independently make medical treatment decisions involving their own care if they demonstrate "sufficient understanding and appreciation of the nature and consequences of treatment despite their chronological age." Fay A. Rozovsky, Consent to Treatment: A Practical Guide, § 5.01[B][3] (4th ed. 2012). The court's recognition of the mature minor doctrine would presumably enable Sheila to refuse any future blood transfusions regardless of the consequences.

3

¶17 The parties acknowledge that states have come to different conclusions about the mature minor doctrine. A number of states have adopted some form of the doctrine, but there is little consistency about how to determine when a minor is "mature" and the full extent of the decisions to which that "maturity" may apply.

¶18 Several states have recognized the "rights" of mature minors by statute. See, e.g., Arkansas (Ark. Code Ann. § 20-9-602(7) (2012)); New Mexico (N.M. Stat. Ann. § 24-7A-6.1.C. (1997)); South Carolina (S.C. Code Ann. § 63-5-340 (2010)); and Virginia (Va. Code Ann. § 63.2-100.2. (2012)). But care must be taken not to misread some of these statutes. For instance, the South Carolina statute provides:

> Any minor who has reached the age of sixteen years may consent to any health services from a person authorized by law to render the particular health service for himself and the consent of no other person shall be necessary <u>unless such involves an operation</u> which shall be performed only if such is essential to the health or life of such child in the opinion of the performing physician and a consultant physician if one is available.

S.C. Code Ann. § 63-5-340 (2010) (emphasis added). It is not clear from this statute whether a minor who has reached the age of 16 years may refuse lifesaving services, especially if those services are authorized by a parent or by a court. A provision of South Carolina's Death with Dignity (or Right to Die) Act, S.C. Code Ann. § 44-77-30 (2002), permits a person to adopt a written declaration that life-sustaining procedures may be withheld, but only <u>if the person is 18 years of age or older</u>.

4

Consequently, while South Carolina "recognizes" the rights of mature minors by statute, the statute is not as far-reaching as the doctrine that Sheila proposes here.

¶19 By contrast, New Mexico's statute appears to be very far-reaching and to cover Sheila's 2012 circumstances. The pertinent statute reads:

> Subject to the provisions of Subsection B of this section, if an unemancipated minor has capacity sufficient to understand the nature of that unemancipated minor's medical condition, the risks and benefits of treatment and the contemplated decision to withhold or withdraw life-sustaining treatment, that unemancipated minor shall have the authority to withhold or withdraw life-sustaining treatment.

N.M. Stat. Ann. § 24-7A-6.1.C. (1997). If this statute had been in effect last year in Wisconsin, Sheila would now likely be dead.

¶20 There also are a number of court decisions that have adopted some form of the mature minor doctrine. See, e.g., Kozup v. Georgetown Univ., 851 F.2d 437, 439 (D.C. Cir. 1988); People v. E.G., 549 N.E.2d 322, 325 (Ill. 1989); Younts v. St. Francis Hosp. & Sch. of Nursing, 469 P.2d 330, 338 (Kan. 1970); In re Swan, 569 A.2d 1202, 1205 (Me. 1990); In re Rena, 705 N.E.2d 1155, 1157 (Mass. App. Ct. 1999); Bakker v. Welsh, 108 N.W. 94, 96 (Mich. 1906); Gulf & Ship Island R.R. Co. v. Sullivan, 119 So. 501, 502 (Miss. 1928); Cardwell v. Bechtol, 724 S.W.2d 739, 748-49 (Tenn. 1987); Belcher v. Charleston Area Med. Ctr., 422 S.E.2d 827, 837-38 (W. Va. 1992). The substance of these decisions is not uniform. To illustrate, the Tennessee Supreme Court adopted the so-called Rule of Sevens, which

5

provides that children under the age of 7 have no capacity to consent to medical treatment, children between the ages of 7 and 14 have a rebuttable presumption of no capacity, and children between the ages of 14 and the age of majority possess a rebuttable presumption of capacity. Cardwell, 724 S.W.2d at 745.

¶21 In 2009 the Supreme Court of Canada exhaustively considered the mature minor doctrine in a case similar to the one before us. A.C. v. Manitoba, [2009] 2 S.C.R. 181 (Can.). In A.C., the statutory law in Manitoba recognized a mature minor's views with respect to her own health care but authorized the Director of Child and Family Services to seek treatment for a child whom the director believed did not understand or appreciate the consequences of the child's decision. The subject of the case was admitted to a hospital when she was 14 years, 10 months old, suffering from internal bleeding caused by Crohn's disease. Id., para. 5. She was a devout Jehovah's Witness, id., who previously had signed an advance medical directive containing her written instructions not to be given blood under any circumstances. Id., para. 6. Her doctor believed that internal bleeding created an imminent risk of death. Id., para. 11. Nevertheless, A.C. refused to consent to a blood transfusion. Id., para. 7.

¶22 A brief psychiatric assessment took place at the hospital on the night after the young woman's admission. Id., para. 6. The Director of Child and Family Services determined her to be a child in need of protection, and sought a treatment

6

order from the court under section 25(8) of the Manitoba Child and Family Services Act, under which the court may authorize treatment that it considers to be in the child's best interests. Id., paras. 8-9. Section 25(9) of the Act presumes that the best interests of a child 16 or over will be most effectively promoted by allowing the child's views to be determinative, unless it can be shown that the child does not understand the decision or appreciate its consequences. Id., para. 9. Where the child is under 16, however, no such presumption exists. See id. As a result, the local court ordered that A.C. receive blood transfusions, concluding that "when a child is under 16 years old, there are no legislated restrictions . . . on the court's ability to order medical treatment in the child's best interests." Id., para. 12 (internal quotation marks omitted). A.C. and her parents appealed the order, arguing that the legislative scheme was unconstitutional because it unjustifiably infringed A.C.'s rights under the Manitoba statute and the Canadian Charter of Rights and Freedoms. Id., para. 14. The Court of Appeal upheld the constitutional validity of the challenged provisions as well as the treatment order. See id., paras. 15-20.

¶23 Writing for a majority of the Supreme Court, Justice Rosalie Abella made the following observations:

> The application of an objective "best interests" standard to infants and very young children is uncontroversial. Mature adolescents, on the other hand, have strong claims to autonomy, but these claims exist in tension with a protective duty on the part of the state that is also justified.

7

. . . .

In the vast majority of situations where the medical treatment of a minor is at issue, his or her life or health will not be gravely endangered by the outcome of any particular treatment decision. . . .

Where a young person comes before the court under s. 25 of the Child and Family Services Act, on the other hand, it means that child protective services have concluded that medical treatment is necessary to protect his or her life or health, and either the child or the child's parents have refused to consent. In this very limited class of cases, it is the ineffability inherent in the concept of "maturity" that justifies the state's retaining an overarching power to determine whether allowing the child to exercise his or her autonomy in a given situation actually accords with his or her best interests. The degree of scrutiny will inevitably be most intense in cases where a treatment decision is likely to seriously endanger a child's life or health.

The more a court is satisfied that a child is capable of making a mature, independent decision on his or her own behalf, the greater the weight that will be given to his or her views when a court is exercising its discretion under s. 25(8). . . . Such an approach clarifies that in the context of medical treatment, young people under 16 should be permitted to attempt to demonstrate that their views about a particular medical treatment decision reflect a sufficient degree of independence of thought and maturity.

. . . When applied to adolescents, therefore, the "best interests" standard must be interpreted in a way that reflects and addresses an adolescent's evolving capacities for autonomous decision making. It is not only an option for the court to treat the child's views as an increasingly determinative factor as his or her maturity increases, it is, by definition, in a child's best interests to respect and promote his or her autonomy to the extent that his or her maturity dictates.

A.C., 2 S.C.R. 181, paras. 82, 85-88.

¶24 The authorities cited above, including the decision of the Supreme Court of Canada, reveal the seriousness that should be afforded to Sheila's position. But her position may not represent the majority view in Wisconsin and it may not represent sound public policy. Asking this court to enshrine Sheila's view into our law is asking the court to make profoundly important policy determinations about the rights of minors as well as the role of parents and the role of the state without statutory guidance. It is asking this court to make up the law on its own initiative. Courts need not and should not leap into controversies that may upset longstanding legal principles unless their involvement is unavoidable. This court's involvement is not unavoidable today.

III

¶25 There are specific reasons why the court is correct in not acting now.

¶26 First, unlike Canada and several states, Wisconsin has not codified a mature minor doctrine into its statutory law. However, Wisconsin does have a statute on advance directives to physicians, Wis. Stat. § 154.03(1) ("Any person of sound mind and 18 years of age or older may at any time voluntarily execute a declaration . . . authorizing the withholding or withdrawal of life-sustaining procedures or of feeding tubes"), and a statute on Power of Attorney for Health Care that specifically provides that "[a]n individual who is of sound mind and has attained age 18 may voluntarily execute a power of attorney for health care." Wis. Stat. § 155.05(1) (emphasis added). By incorporating the

9

adult age of 18 into these statutes, the legislature appears to have made a policy choice that is relevant to the present case.

¶27 Counsel have not briefed the applicability, if any, of any provision of Wis. Stat. § 51.61.

¶28 Second, the court is reviewing this case against the backdrop of State v. Neumann, 2013 WI 58, ___ Wis. 2d ___, ___ N.W.2d ___, in which the court upheld the convictions of Dale and Leilani Neumann for second-degree reckless homicide in the death of their 11-year-old daughter Kara. Kara died from diabetic ketoacidosis resulting from untreated juvenile onset diabetes mellitus. Id., ¶1. Her parents were concerned about Kara's health and prayed for her recovery, but they never tried to secure medical treatment for her. After Kara died, her parents were prosecuted for second-degree reckless homicide. Id.

¶29 Although I disapproved of the parents' neglect, I dissented from their convictions under the second-degree reckless homicide statute because I thought the statutory scheme was "very difficult to understand and almost impossible to explain." Id., ¶213 (Prosser, J., dissenting). The statutory scheme presented notice issues to potential defendants, including the question of when a failure to act amounts to reckless conduct. The court said the answer to when a failure to act amounts to reckless conduct is when the failure violates a "legal duty." Id., ¶94.

¶30 The majority in Neumann had no problem determining that the Neumanns violated a "legal duty" to provide medical

10

care to their daughter. Against that background, what is the parental duty here? Sheila's parents refused to consent to lifesaving blood transfusions for their daughter. Would Sheila's parents have escaped criminal responsibility if Sheila had died from not receiving blood transfusions if the parents claimed that they had delegated medical decision-making to their daughter? Stated differently, does a state's adoption of a mature minor doctrine relieve parents of whatever duty they have to provide medical care to their "mature" children? These questions have not been briefed, and, in my view, the court is unprepared to answer them.

¶31 Third, permitting a minor to refuse lifesaving medical treatment comes uncomfortably close to permitting a minor to commit suicide.

¶32 Wisconsin law provides that, "[w]hoever <u>with intent that</u> another take his or her own life assists such person to commit suicide is guilty of a Class H felony." Wis. Stat. § 940.12 (emphasis added). At first glance, this statute would not appear to be implicated in a situation where a minor is permitted to refuse blood transfusions. In such a case, a potential defendant would not normally have the <u>purpose</u> that the minor commit suicide. However, the phrase "with intent that" also means a defendant was aware that his or her conduct was practically certain to cause (the minor) to commit suicide.

¶33 What is suicide? On this point, Sheila's doctors did not believe that she had a terminal illness. Assuming that she is still alive, her doctors were correct. But Sheila's

11

attending physician predicted that she would die without blood transfusions. There was no alternative treatment to preserve her life. Refusing to agree to the only known treatment to save one's life is suicidal unless a person's condition is terminal.[2] Facilitating suicidal conduct in these circumstances is practically certain to cause the person's death.[3] Here, the "person" is a minor.

¶34 The mature minor doctrine anticipates that the state will take steps to assure that a minor has the maturity and understanding to knowingly, intelligently, and voluntarily make the decision whether to act to preserve her own life. This is likely to put courts in the unenviable position of either prohibiting or permitting a minor's suicidal conduct.

¶35 Courts are often obligated to enforce law that they may not approve. They are not obligated to create law that they do not approve. To my mind, it is not sound public policy to force courts to give their imprimatur to a minor's commitment to martyrdom.

---

[2] See Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 293 (1990) (Scalia, J., concurring) ("American law has always accorded the State the power to prevent, by force if necessary, suicide—including suicide by refusing to take appropriate measures necessary to preserve one's life").

[3] Cf. Lenz v. L.E. Phillips Career Dev. Ctr., 167 Wis. 2d 53, 70, 482 N.W.2d 60 (1992) ("It is difficult not to view the withdrawal of artificial feeding as inducing death through starvation and dehydration.").

¶36 Finally, Sheila told her attending physician that she would rather die than endure the "stigma of having received a transfusion."

¶37 According to the American Red Cross, 30 million blood components are transfused each year in the United States. Am. Red Cross, Blood Facts and Statistics, http://www.redcrossblood.org./learn-about-blood/blood-facts-and-statistics (last visited June 27, 2013). These blood components are received by approximately 5 million patients from more than 9 million donors. Id. There is little stigma attached to blood transfusions among the population at large, although there is often concern about the safety of the blood supply.

¶38 Jehovah's Witnesses are one of the most notable exceptions. They consider the issue of blood transfusions to be "a religious issue rather than a medical one. Both the Old and New Testaments clearly command us to abstain from blood." Watch Tower Bible and Tract Society of Pa., Why Don't You Accept Blood Transfusions?, http://www.jw.org/en/jehovahs-witnesses/faq/jehovahs-witnesses-why-no-blood-transfusions/ (citing Genesis 9:4; Leviticus 17:10; Deuteronomy 12:23; Acts 15:28, 29) (last visited June 27, 2013). Some Jehovah's Witnesses have been accused of disfellowshipping, even shunning, members who consent to blood transfusions. See Osamu Muramoto, Bioethical aspects of the recent changes in the policy of refusal of blood by Jehovah's Witnesses, Brit. Med. J., Jan. 6, 2001 at 37-39. The court is not in a position to evaluate these accusations on the evidence before us. However, the existence

13

of these accusations inevitably raises questions about whether a minor's decision to refuse blood transfusions——at the risk of her own death——is truly a voluntary decision when the minor is a Jehovah's Witness.

¶39 The issues raised in this writing will be no easier for the legislature than for this court. But the court ought to defer to the principal lawmaking branch of government before it tries to make policy on its own initiative.

¶40 For the foregoing reasons, I respectfully concur.

14

¶41 MICHAEL J. GABLEMAN, J. *(dissenting).* Two important issues are presented in this case: (1) should Wisconsin recognize the mature minor doctrine, which permits those under 18 years of age to refuse life-saving medical care under some circumstances?; and (2) does a minor have a due-process right to refuse medical treatment? Instead of answering them, the court washes its hands of the matter and declares the case moot. As this court has a responsibility to decide matters of great public importance that are likely to recur but evade appellate review, I dissent from the decision to dismiss this appeal.

¶42 A brief recitation of the facts and procedural history is necessary to demonstrate the absurdity of the majority's refusal to decide this case. In February 2012, 15-year-old Sheila W. was diagnosed with aplastic anemia, a condition that prevents her bone marrow from producing blood cells. If left untreated, the condition is fatal. Sheila was admitted to the hospital on February 25, 2012 and given antibody treatments. After three days of treatment, however, her blood platelet count remained at a critically low level, putting her at risk of spontaneous hemorrhage, cardiac arrest, and respiratory distress. Sheila's treating physician thus recommended that she undergo blood transfusions. Without these transfusions, her doctor stated that she would die.

¶43 Sheila and her parents, though, are Jehovah's Witnesses, who believe that the Bible requires them to "abstain from blood." Receiving a blood transfusion would violate this belief, and Sheila described it as tantamount to "rape." Her

parents, citing deference to their daughter's decision, stated they would not force a transfusion upon her, even knowing she would die.

¶44 Due to the high risk of imminent death, Dane County took emergency custody of Sheila on February 29. The County then filed a petition for protective services the next day, seeking temporary physical custody of Sheila to administer the blood transfusions. See Wis. Stat. § 48.13(10). On Friday, March 2, the circuit court held a hearing in the hospital. The court found that Sheila's parents were "seriously endanger[ing]" her health by refusing to consent to the transfusions. But instead of granting the petition for temporary physical custody, the court appointed a temporary guardian pursuant to Wis. Stat. § 54.50(1). The order gave the guardian authority to "[d]ecide whether to consent to medical treatment." Sheila's motion to stay the order pending an appeal was denied by the circuit court. Sheila's appointed guardian consented to the blood transfusions, the first of which was successfully performed later that day. The following Monday, the day before Sheila was scheduled for another transfusion, she filed a notice of appeal. The court of appeals also denied Sheila's motion to stay the transfusions pending an appeal, stating that "the irreparable harm Sheila would suffer if forced to undergo continued blood transfusions against her religious beliefs is outweighed by the irreparable harm to the public interest in preserving life and protecting minors that would occur if Sheila were to die while the appeal is pending." However, the court did state that "it

2

would be open to a motion to expedite this appeal to minimize the length of time Sheila receives transfusions, in the event that the guardianship order is ultimately reversed by this court or the Wisconsin Supreme Court."

¶45 By the time the case was fully briefed before the court of appeals, the temporary guardianship order had expired. While conceding that her appeal was thus moot because she no longer needed the transfusions, Sheila argued that her case nonetheless fell under one of the exceptions to the general rule that a court does not decide moot issues. We have stated that a court may address moot issues when: the issue has great public importance, a statute's constitutionality is involved, a decision is needed to guide the trial courts, or the issue is likely to repeat yet evade review because the situation at hand is one that typically is resolved before completion of the appellate process. Sauk Cnty. v. Aaron J.J., 2005 WI 162, ¶3 n.1, 286 Wis. 2d 376, 706 N.W.2d 659 (per curiam). In a two-page summary order, the court of appeals concluded that Sheila's appeal did not satisfy any of the exceptions to mootness.

¶46 Sheila filed a petition for review on November 27, 2012. In its response to the petition, Dane County argued that the court of appeals correctly dismissed the case as moot. On January 15, 2013, we granted Sheila's petition for review. On February 7, we assigned the case for oral argument. Each party filed briefs. Oral argument was held April 11.

¶47 The subject of mootness was only glancingly touched upon at oral argument. In her opening statement to the court,

3

Dane County's attorney said, "Dane County asks that you dismiss this appeal as moot. The County believes that's the most appropriate outcome in this case, one that leaves the delicate social balancing that we have been talking about among complex and competing policy interests to the legislature." No follow-up questions on mootness were asked. In fact, the issue of mootness received only passing, perfunctory references during the 70-minute oral argument. No member of this court asked Sheila's attorney for her position on mootness, and she did not offer it.

¶48 Based on this court's actions since granting the petition for review in January, Sheila W. is entitled to feel blindsided by today's decision to dismiss her appeal as moot. And upon reading the per curiam issued by four members of this court, her shock is likely to turn to confusion. The per curiam assures us that "[t]his case undoubtedly presents issues of great public importance. . . . Furthermore, it appears that orders appointing temporary guardians for the purpose of determining whether to consent to life-saving medical care are capable and likely [to repeat] and yet will evade appellate review." Per Curiam, ¶7. In other words, according even to the per curiam opinion, Sheila meets two of the exceptions to mootness.[1]

¶49 Despite these conclusions, the per curiam holds: "In this instance, we deem it unwise to decide such substantial

---

[1] I would add that this case also satisfies a third exception to mootness: a decision is needed to guide the trial courts.

social policy issues with far-ranging implications based on a singular fact situation in a case that is moot."  Per Curiam, ¶8.  I do not understand what the majority means by this. "Singular," as the per curiam uses the word, would seem to mean "unique," "beyond what is ordinary," or "strange or unusual." The American Heritage Dictionary of the English Language 1636 (5th ed. 2011).  I fail to see why the facts in this case make it a bad candidate to evaluate whether Wisconsin should adopt the common law mature minor doctrine or decide the scope of a minor's due-process rights.  The mature minor doctrine asks when and whether someone under the age of 18 should be permitted to refuse medical care.  See e.g., Illinois v. E.G., 549 N.E.2d 322, 327-28 (Ill. 1989).  This case presents about as clear an opportunity to address that question as can be imagined. Furthermore, why does a "singular fact situation" make a particular case unworthy of our review?  Every case to some extent has a "unique" set of facts, and many have "strange or unusual facts."  To say that a case of "great public importance" cannot be resolved because the particular facts are "singular" is no answer at all.[2]

---

[2] Justice Prosser's concurrence attempts to provide the rationale lacking from the per curiam.  Much of the concurrence, however, reads like a dissent from a decision to adopt the mature minor doctrine, which this court has not done.  See concurrence, ¶¶24, 31, 34, 35.  To be clear, this dissent does not take a position on whether the court should adopt the mature minor doctrine or whether minors have a due-process right to refuse medical treatment because a majority of this court inexplicably does not want to decide those issues.

¶50 Paradoxically, the court uses <u>Eberhardy v. Circuit Court for Wood Cnty.</u>, 102 Wis. 2d 539, 307 N.W.2d 881 (1981) as its fig leaf. <u>Eberhardy</u> presented the question of "whether the circuit court has jurisdiction to authorize the duly appointed guardians of an adult mentally retarded female ward to give their consent to surgical procedures which will result in the permanent sterilization of the ward when such sterilization is for contraceptive and therapeutic purposes," and if the circuit court had such jurisdiction, whether it was "appropriate for the court to exercise it for this purpose." <u>Id.</u> at 541-42. We held that although the circuit courts had jurisdiction over a guardian's petition seeking sterilization of an incompetent ward, they were not permitted to exercise that jurisdiction until the legislature provided clear guidelines in the area. <u>Id.</u> at 578-79. In doing so we stressed the "irreversible" nature of sterilization. <u>Id.</u> at 567, 568, 572, 575, 577, 585, 592. However, in a passage that should give the majority pause, we stated: "The inevitability of the consequences of not acting judicially in this case does not approach the degree that might force a choice if the question were one of invoking state power to order treatment for one who would die without it." <u>Id.</u> at 575. Thus by its own terms <u>Eberhardy</u> does not dictate the result reached by the court today. In fact, it counsels just the opposite.

¶51 Equally important, <u>Eberhardy</u> shows that the legislature does not always act quickly in response to this court's prodding. The only Wisconsin statute to address the

6

sterilization of incompetents, Wis. Stat. § 54.25(2)(c)e., provides that if an individual is declared incompetent and a guardian appointed, the circuit court may "declare that the individual has incapacity . . . to consent to sterilization, if the court finds that the individual is incapable of understanding the nature, risk, and benefits of sterilization, after the nature, risk, and benefits have been presented in a form that the individual is most likely to understand." Yet it was not until 25 years after Eberhardy that this statute was enacted! 2005 Wis. Act 387, § 100 (effective May 25, 2006). As Justice Callow pointed out in his Eberhardy dissent, "[a]part from any aversion legislators may have to addressing a controversial question, there is the added practical problem of the press of legislative business. The thousands of problems presented to the legislature tax its ability to respond thoughtfully to the multiple problems of society." 102 Wis. 2d at 605. As the history following Eberhardy reveals, the Sheila W.s of this state may have to wait a long time before the legislators on white horses arrive. In the meantime, the actual problem of what to do with minors who refuse life-saving treatment will remain unresolved.

¶52 Additionally, the question of the mature minor doctrine is not just an abstract academic debate. The decision over whether this state should adopt such a doctrine will literally have life or death consequences for people such as Sheila W. Currently, the circuit courts have no standard to apply when presented with a minor who refuses life-saving

7

medical care. Frighteningly, this raises the specter that a child's life could depend on which judge within a county is assigned the case.[3] Unfortunately, four members of this court refuse to offer any guidance to circuit court judges who must actually adjudicate these difficult situations.

¶53 The case is just as moot now as it was when we granted the petition for review back on January 15. If the court did not want to decide the issues presented in this case, it should not have granted the petition for review, ordered briefing, and then held oral argument. What function is served when a law-developing court takes a summary order declaring a case moot and affirms it with a summary order declaring a case moot? Life is about hard choices, particularly for members of a state high court. Unfortunately, today the only thing the parties receive for their time and trouble before this court is abdication dressed as modesty.

¶54 I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and ANNETTE KINGSLAND ZIEGLER join this dissent.

---

[3] The concurrence states that we should not adopt the mature minor doctrine because it would put courts "in the unenviable position of either prohibiting or permitting a minor's suicidal conduct." Concurrence, ¶34. Aside from inappropriately assuming that this court would adopt the doctrine if the case were not moot, the concurrence's statement is ironic because the decision of this court to not answer the questions presented is what will put circuit courts in the position of making ad hoc life or death decisions. If Sheila were to relapse and require blood transfusions again before her eighteenth birthday, how would the members of the majority advise a court to handle the matter? Would it have been wrong for the circuit court judge in this case to allow Sheila to die? Inaction by the majority will lead to the patchwork approach the concurring Justice is attempting to avoid.